The appellant, Thomas Cooper, was convicted of murder, a violation of § 13A-6-2, Code of Alabama 1975. He was sentenced to life imprisonment.
The appellant presents four issues on appeal.
 I
Initially, the appellant contends that the evidence was insufficient to establish a prima facie case of murder. Section13A-6-2, Code of Alabama 1975, provides, in pertinent part, as follows: "A person commits the crime of murder if: (1) With intent to cause the death of another person, he causes the death of that person. . . ."
The state's evidence tended to show that in the early evening of December 31, 1989, the Montgomery Police Department received an anonymous telephone call reporting a dead body located behind a building at 864 Bell Street in Montgomery. Upon arriving on the scene, police found the corpse of a woman lying face-down nearly two feet from the back of the building with her pants pulled down below her waist. The victim had several injuries to her head caused by a blunt object and two stab wounds to her neck. The cause of death was later determined to have resulted from massive internal and external bleeding caused by her multiple wounds. *Page 462 
An investigation of the scene revealed a blood-covered brick lying near the corner of the building. Further, officers found three large blood stains on the back wall of the building, the furthest of which was nearly 30 feet away, while the closest was right over the body.
A few hours after the body was discovered, police officers were called to the nearby Salvation Army Shelter, which was separated from the crime scene by a gasoline service station, by a man claiming to have received a bag of bloody clothing. The man, Bobby Adams, told the officers that the appellant, who lived at the Salvation Army Shelter, had given him the bag of clothing and had told him to dispose of it. Inside the bag, the officers found a red t-shirt, undershorts, blue jeans, and a towel from a Holiday Inn. All of the articles were covered with blood. After receiving consent from the appellant to search his footlocker at the Salvation Army, the officers discovered a camouflage jacket, three white athletic socks, and a sleeveless white undershirt. These items also had blood on them.
Laboratory analysis revealed that the blood on each article of clothing was consistent with the victim's type. The blood on the towel was from someone wiping his hands on it, but was of such consistency that a blood type could not be ascertained. Laboratory analysis also could not determine the type of blood on the brick, but did reveal that the hair matted on the brick was consistent with the victim's. One of the blood stains on the wall of the building was consistent with the victim's type. Further, semen stains were found in the appellant's shorts, while the rape kit results of an anal smear performed on the victim revealed sperm consistent with the appellant's.
In a statement to the police, the appellant said that, on the night of the December 29, he had been at a friend's house until around 10:00 when he left to return to the Salvation Army Shelter. On the way, he got in a fight with two black males but received no injuries. After that, he discovered the bag of bloody clothes at the gas station between the Salvation Army Shelter and the building where the victim would eventually be discovered, took them back to his room, and hid them in his nightstand. He also stated that he was wearing black corduroy pants, a black shirt, burgundy loafers, and a camouflage jacket that evening.
At trial, however, a clerk at the gas station stated that she saw the appellant that evening and that he had not been wearing black corduroy pants, but that he had been wearing jeans. Also, she said that he was walking with a woman that fit the victim's description.
Adams testified that, on December 29, he spoke with the appellant near the Salvation Army at approximately 10:00 p.m. At that time, the appellant was wearing a clean pair of jeans and a clean camouflage coat and his appearance was clean. At approximately 11:00, the appellant returned to the Salvation Army Shelter, where he spoke with Adams outside the back door. The appellant's clothes were now covered with dark stains. The appellant told Adams that he had been "jumped" by three or four guys and that someone had gotten "fucked up bad, real bad." The appellant then went to take a shower, and Adams brought him a towel to dry off. When the appellant got out of the shower, Adams noticed a spot of blood under the appellant's nose.
On the afternoon of December 31, according to Adams, the appellant asked him to throw a bag of dirty clothes in the garbage for him. After discovering blood on the clothes, Adams called the police. He then spoke to the appellant in the bathroom at the Salvation Army Shelter. The appellant first denied knowing the victim, and then went to retrieve a pocketknife which he asked Adams to throw away for him. When Adams refused, the appellant wrapped the knife in toilet paper and flushed it down the commode.
Finally, Adams stated at trial that the appellant, after his arrest, told him that he had been smoking crack cocaine with the victim on the night of her death. The appellant also said to him that he had been having sex with the victim behind the building *Page 463 
at 864 Bell Street when someone walked up behind them and said, "Bitch, give me your money." The appellant told Adams that he panicked and fled. Adams, however, stated that the appellant would never run from a fight.
The appellant, in testifying at trial, admitted that he had been with the victim behind 864 Bell Street having sex and smoking crack before they were attacked by a group of men. The appellant stated that he fled, but returned later to find the victim dead. It was at that point that his clothes became stained with her blood. He also stated that he had made the anonymous 911 phone call reporting the victim's body to the police and denied giving a knife to Adams.
There were several inconsistencies in the testimony. For example, on cross-examination, the appellant stated that he had engaged in vaginal intercourse with the victim, not anal. The forensic analysis revealed that the victim had engaged only in anal intercourse on the night of her death. Also, the state produced the rebuttal testimony of the victim's sister, who testified that the victim's right arm had been completely paralyzed in a car accident. Given the fact that the victim's right arm was completely paralyzed, the appellant's description of the victim's activities just before the alleged attack would have been impossible.
On appeal, the appellant contends that the evidence was insufficient to establish a prima facie case of murder against him. He points to the fact that a bloodstain, found 30 feet from the body on the wall of the building at 864 Bell Street, was of a type characteristic of neither the victim nor the appellant. He contends that his trial testimony was evidence of his innocence.
In reviewing a conviction, we must view the evidence in a light most favorable to the prosecution. White v. State,546 So.2d 1014 (Ala.Cr.App. 1989). Though not all of the evidence in this case is direct evidence, circumstantial evidence is entitled to the same weight as direct evidence, provided that it points to the guilt of the accused. Hinton v. State,548 So.2d 547 (Ala.Cr.App. 1988), aff'd, 548 So.2d 562 (Ala. 1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383
(1989); White, supra. Conflicting evidence presents a jury issue. Curry v. State, 601 So.2d 157 (Ala.Cr.App. 1992); Smithv. State, 583 So.2d 990 (Ala.Cr.App.), writ denied,583 So.2d 993 (Ala. 1991).
After reviewing the facts as set out above, we hold that the evidence was sufficient for the jury to find the appellant guilty of murder. See, e.g., Bland v. State, 601 So.2d 521
(Ala.Cr.App. 1992).
 II
Next, the appellant contends that his constitutional rights to equal protection of the law and to a fair trial were violated when the court denied his Batson v. Kentucky[1] motion. More specifically, the appellant argues that the prosecution illegally used its peremptory strikes to exclude blacks from the jury.
In Batson, the United States Supreme Court held that the prosecution violates equal protection when it peremptorily strikes "potential jurors [from the venire] solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89, 106 S.Ct. at 1719. After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike of a minority veniremember. See, e.g., Ex parte Bird, 594 So.2d 676
(Ala. 1991). We will reverse the circuit court's ruling on theBatson motion only if it is "clearly erroneous." Jackson v.State, 549 So.2d 616 (Ala.Cr.App. 1989).
In this case, the appellant is a black male. The prosecution used peremptory strikes to remove seven of nine blacks from the venire, leaving two blacks to serve on the jury. When the appellant concluded his argument on his Batson motion, the circuit *Page 464 
court directed the appellant to read out the numbers of the state's allegedly discriminatory strikes. As each number was read, the state was directed to respond with its grounds for striking that juror.
The record reveals that the appellant read out the names of only six excused veniremembers, not seven, and therefore, the state explained only six of its strikes. In presenting theBatson motion to the circuit court, the appellant never indicated that seven veniremembers were discriminated against. The appellant stated out that "seven of the nine strikes used by the state were used to strike blacks from the venire," but specifically stated that the "prosecutor used his peremptory challenges in a racially discriminatory manner against the following veniremembers" and read only six juror numbers. Further, before reading the number of the sixth juror, the appellant indicated that he had "finally" reached the last juror. After the state gave its reason for removing that juror, the appellant responded, "I believe that's all." At that time, the court denied the appellant's Batson motion.
Merely "one unconstitutional peremptory strike has been held to require reversal and a new trial." Bird, 594 So.2d at 683. Further, when the circuit court directs the prosecution to explain the rationale behind its peremptory strikes without first ruling on whether the appellant has established a prima facie case of discrimination, we approach the case as if the circuit court had specifically found a prima facie case of discrimination. It then is incumbent upon us to review all of the prosecution's reasons. Battle v. State, 574 So.2d 943
(Ala.Cr.App. 1990).
We must review the prosecution's reasons for the removal of only those six jurors the striking of whom to whose strikes the appellant objected to.[2] Cf., Scales v. State, 539 So.2d 1069
(Ala.Cr.App.), rev'd on other grounds, 539 So.2d 1074
(Ala. 1988) (appellant objected to the "strikes regarding all of the black minority members," corrected the judge when he listed only three jurors, and identified the fourth).
At trial, the prosecution explained that the names of five of the veniremembers that were struck appeared on a computer printout from the Alabama Criminal Justice Information Center as having had prior felony charges or convictions or misdemeanor convictions. This reason for exercising a peremptory strike is race neutral. See, e.g., Scott v. State,599 So.2d 1222 (Ala.Cr.App.), writ denied, 599 So.2d 1229
(Ala. 1992); Sims v. State, 587 So.2d 1271 (Ala.Cr.App. 1991), cert. denied, _____ U.S. ___, 112 S.Ct. 1179, 117 L.Ed.2d 423
(1992); Cowan v. State, 579 So.2d 13 (Ala.Cr.App. 1990). Also, members of the victim's family indicated that they knew one of the five veniremembers who had a prior criminal record and asked that he be struck. A potential juror's association with any of the parties involved in the case is a race-neutral reason for that veniremember's removal. See, e.g., Ex parteLynn, 543 So.2d 709 (Ala. 1988), cert. denied, 493 U.S. 945,110 S.Ct. 351, 107 L.Ed.2d 338 (1989) (juror worked with co-defendant's father; juror lived near co-defendant; juror lived near person who worked with defense attorney); Kelley v.State, 602 So.2d 473 (Ala.Cr.App. 1992) (veniremember worked with two state witnesses); Battle v. State, 574 So.2d 943
(Ala.Cr.App. 1990) (juror knew defendant's brother).
Finally, the prosecution stated the following rationale for striking juror number 401:
 "[PROSECUTING ATTORNEY]: . . . [W]e had two things. One, we were concerned about him because he wore sunglasses in the courtroom, which the state would recognize that is not a sufficient reason in and of itself. We felt there was a certain attitude about him. We know that is not sufficient, but he was *Page 465 
the only individual wearing sunglasses. What made the decision for us, coupled with the other considerations, was when the juror himself answered the juror questionnaire provided by the Montgomery County Bar Association. There was a question on there that read: 'Is there any reason you feel you cannot or should not serve on a jury?' . . . [T]his particular juror answered yes and his explanation was 'It is not my place to decide about whether someone or something has done something against the law.' This is very similar to a juror which the court [itself] reviewed in this case and determined that juror not qualified to serve.
 "THE COURT: You got that information from the venire questionnaire? Let the record show that is accessible to both sides. They are held in the law library."
Strikes based on demeanor "should be closely scrutinized,"Avery v. State, 545 So.2d 123, 127 (Ala.Cr.App. 1988). "Unarticulated 'gut feelings' about a veniremember will not rebut a Batson challenge," Bird, 594 So.2d at 684, however accurate they may be. The removal of the veniremember in this case was for more substantial or articulable reasons than "seat-of-the-pants instinct." Removal of a veniremember based on his attitude or for wearing sunglasses in the courtroom has been recognized as a race-neutral reason. See, e.g., Scott, supra; Mitchell v. State, 579 So.2d 45 (Ala.Cr.App. 1991);Currin v. State, 535 So.2d 221 (Ala.Cr.App. 1988). Further, juror number 401 was the only veniremember removed because of his demeanor, giving this explanation more weight. Avery,545 So.2d at 127. The other reason for striking juror number 401 was race-neutral: he did not feel that it was his place to sit on the jury in judgment of others. See, e.g., Kelley, supra;Battle, supra.
We hold that the circuit court did not err in denying the appellant's Batson motion.
 III
The appellant also contends that he was deprived of due process, equal protection, and a fair trial when the circuit court denied his request for access to the computer printout from the Alabama Criminal Justice Information Center ("ACJIC") that the prosecution was planning to use in striking the jury.
Before the jury was struck, the appellant requested access to the ACJIC computer printout listing the criminal history of all veniremembers. In arguing that the denial of such access would deprive him of a fair trial, the appellant stated that the only way he could get that information was to pay for it. The circuit judge denied his motion and explained to him that information disclosing a veniremember's possible criminal history is available from other sources. Further, the judge pointed out that he had granted every request for funding that the appellant had made and, had the appellant asked for money to access each veniremember's prior criminal history, he would have granted that request also.
"[T]he appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors." Kelley, 602 So.2d at 477; Slinker v. State,344 So.2d 1264 (Ala.Cr.App. 1977). See Davis v. State, 554 So.2d 1094
(Ala.Cr.App. 1986), aff'd, 554 So.2d 1111 (Ala. 1989), rehearing overruled, 569 So.2d 738 (Ala. 1990), cert. denied, ___ U.S. _____, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state's witnesses); Wright v. State, 424 So.2d 684
(Ala.Cr.App. 1983) (no absolute right to disclosure of criminal records of state's witnesses). Further, the state has no duty to disclose information that is available to the appellant from another source (e.g., voir dire). Kelley, supra; Hurst v.State, 469 So.2d 720 (Ala.Cr.App. 1985). See also Clifton v.State, 545 So.2d 173 (Ala.Cr.App. 1988) (nondisclosure did not prejudice appellant's defense).
Here, the appellant never questioned the actual existence of the removed veniremembers' criminal histories, nor did he question whether any white veniremembers with similar convictions or charges were left on the jury. Rather, he objected solely *Page 466 
to the court's refusing him access to the printoutbefore the jury was struck. Thus, the circuit court did not err in denying the appellant's request for access to the ACJIC computer printout of each veniremember's prior criminal history. Cf., Ex parte Thomas, 601 So.2d 56 (Ala. 1992) (denial of appellant's request for veniremember conviction list made pursuant to his Batson motion was error where prosecutor admitted that some whites left on the jury had misdemeanor convictions).
 IV
Finally, the appellant contends that he was deprived of due process and equal protection of the law and was denied a fair trial by the presence of an armed and uniformed bailiff at his side during his trial testimony.
The appellant failed to preserve this matter for review because he did not object to the deputy's presence until the court recessed for the day, which was after the appellant had been testifying for some time. "In order to preserve an issue for appellate review, a timely objection at trial must be made." Acoff v. State, 435 So.2d 224, 225 (Ala.Cr.App. 1983). See also Story v. State, 588 So.2d 948 (Ala.Cr.App. 1991);Newsome v. State, 570 So.2d 703 (Ala.Cr.App. 1990).
Even had the appellant correctly preserved this argument, no prejudicial error was committed. Here, the circuit judge rationalized the positioning of the bailiff as follows:
 ". . . The deputy is a security. [The appellant] is charged with murder and he is in jail. [The jurors] have to have security. I am not going to get in between that. I find nothing suggestive about that. He's already testified that he is incarcerated. He testified to that. So the jury knows he is incarcerated. I think the jury would think someone would be remiss in their duty if they didn't have a deputy between them and the defendant."
In Goodwin v. State, 495 So.2d 731 (Ala.Cr.App. 1986), we upheld the court's positioning several guards around the defendant during the entire trial:
 "It is not necessary that there be a formal record of a certain type of misconduct to justify the posting of armed guards. Within constitutional limits, great weight must be accorded the discretion of the trial court. The trial judge is responsible for maintaining order in his courtroom. He understands infinitely better than we what is necessary to perform his duty."
495 So.2d at 733.
For the foregoing reasons, the judgment in this case is due to be affirmed.
AFFIRMED.
All the Judges concur.
[1] 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)
[2] The appellant did specify that seven jurors were illegally removed in his motion for new trial. This motion, however, was filed on January 15, 1992, well after the jury's December 9 verdict. A Batson objection must be made before the jury has been sworn. Ross v. State, 581 So.2d 495 (Ala. 1991); Reese v.State, 549 So.2d 148 (Ala.Cr.App. 1989).