The appellant, Cleavon Fletcher, was convicted of robbery in the first degree, a violation of § 13A-8-41, Code of Alabama 1975, and was sentenced, as a habitual offender, to life imprisonment without the possibility of parole.
On appeal, Fletcher claims that the trial court erred in denying his motion made pursuant to Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he claims that the state's explanation for striking one of two black members of the jury venire was not supported by the record, that no follow up questions were asked of that black veniremember and that the state failed to strike a similarly situated white veniremember. During jury selection, the following occurred:
 "Mr. Matthews [prosecutor]: I'm going to expand that a little bit in the same kind of way we talked about family and close friends before, but I want to limit it here to just violent crimes, not burglaries or thefts or breaking into cars or stealing cars or anything like that.
 "Any of you had any family member that you have not told me about already, family member or friends, victims of violent assaults, murder, rape? Mrs. [W.].
"Juror [W.] [black veniremember]: A nephew.
"Mr. Matthews: What happened to your nephew?
"Juror [W.]: He was shot. *Page 433 
"Mr. Matthews: He was shot?
"Juror [W.]: And a half-brother.
"Mr. Matthews: All right. What happened to him?
"Juror [W.]: He was shot.
 "Mr. Matthews: He was shot, too? What happened as a result of those, was somebody prosecuted or what?
 "Juror [W.]: I really don't know what happened — well, in both cases they went to jail.
 "Mr. Matthews: Uh-huh. Do you know for how long?
"Juror [W.]: How long? I can't remember.
"Mr. Matthews: All right.
"Juror [W.]: I don't know if they are still in.
 "Mr. Matthews: Did your nephew and your half-brother both survive getting shot?
"Juror [W.]: My nephew died.
"Mr. Matthews: What was his name?
"Juror [W.]: What was his name?
"Mr. Matthews: Uh-huh.
"Juror [W.]: [R.W.]
 "Mr. Matthews: What was your half-brother's name?
"Juror [W.]: [J.P.]
"Mr. Matthews: All right.
"Juror [W.]: Jr.
". . . .
Mr. Matthews: Mr. [S.].
 "Juror [S.] [white veniremember]: Cousin was murdered in Florida."
(R. 63-68.)
A little later during the voir dire examination, the prosecutor asked the following questions:
 "Mr. Matthews: All right. For those of y'all that have been victims or had family members or friends that were victims, do all of y'all — and we know lots of situations we would like for more to be done, and you never put somebody back in the position that they were in before obviously when they have been shot and killed or injured or something like that — you can never put somebody back in the situation like they were before — do any of you have a negative feeling toward law enforcement in the cases where you were a victim? You feel like the police didn't do enough, should have handled the case better than they did, D.A.'s office should have prosecuted it better, whether it was here or somewhere else?
". . . .
 "Mr. Matthews: Anybody else have negative feelings toward law enforcement or police because of the way your cases were handled or not handled, the way you think or your friend's cases, something else should have been done or wasn't done? You may feel that way. Is there anybody here who just has a problem with the Decatur Police Department, whether it arises out of a speeding ticket you got recently or you didn't feel like it was fair or anything like that or you just have problems with the Decatur Police Department? They are the investigating agency in this case. Anybody have any problem like that?"
(R. 70-73.) Neither veniremember W. nor veniremember S. responded to either of the above questions asked by the prosecutor. Several veniremembers, including W., stated that they had heard about the alleged offenses; the parties and the trial court asked additional questions of these jurors, individually:
"Mr. Matthews: Mrs. [W.], is that right?
"Juror [W.]: Uh-huh.
 "Mr. Matthews: I have a hard time hearing today.
 "Mrs. [W.], you answered that you either read something in the paper or knew something about this case or somebody told you something about it. Just tell us what you know.
 "Juror [W.]: The Bud's — I had just heard that, you know, the store had been robbed.
"Mr. Matthews: The one on Danville Road?
"Juror [W.]: Right. Uh-huh. *Page 434 
 "Mr. Matthews: How did you hear about it? Did somebody tell you or did you read about it in the paper?
 Juror [W.]: Somebody told me. A coworker or somebody at work told me about it.
 "Mr. Matthews: Did they tell you anything of the details of how it happened or anything?
"Juror [W.]: No.
"Mr. Matthews: Just it had been robbed?
"Juror [W.]: Right.
 "Mr. Matthews: If it came out in court that you did remember a detail or something like that, and it came out in court that the testimony and evidence you heard in this case was different from what your friend had told you or what had been passed on to you —
"Juror [W.]: Uh-huh.
 "Mr. Matthews: Could you go by what you heard in court and put the other part out of your mind and go by what you heard in court in case it is different in some fashion?
"Juror [W.]: Yes.
"Mr. Matthews: You could do that?
"Juror [W.]: Yes.
 "Mr. Matthews: I don't have any other questions.
"The Court: Ms. Ferguson [defense counsel].
"Ms. Ferguson: No questions.
 "The Court: Mr. Mason [counsel for codefendant].
 "Mr. Mason: Just a couple. Mrs. [W.], you say a coworker told you about the Bud's robbery?
 "Juror [W.]: Yes, somebody at work just came to work the next day —
"Mr. Mason: Where do you work?
"Juror [W.]: At Sears [department store].
 "Mr. Mason: At Sears. Okay. Was that person that told you about that robbery related to the person that was robbed?
"Juror [W.]: No.
"Mr. Mason: Thank you."
(R. 113-18.)
 "Ms. Ferguson: Mr. Matthews told you about the three locations of the three robberies in which Cleavon Fletcher is named as a defendant, that being South Central Bell location on Beltline, Bud's Convenience Store on Danville Road and J-Mart on Sixth Avenue. Do any of you regularly patronize those businesses on a frequent or daily basis?
"(JUROR [W.] RAISED HER HAND)
"Ms. Ferguson: Mrs. [W.]?
"Juror [W.]: Uh-huh.
"Ms. Ferguson: Which ones of those?
"Juror [W.]: Bud's.
"Ms. Ferguson: The Bud's?
"Juror [W.]: Yes."
(R. 141-42.)
After the jury was selected, the following occurred:
 "Ms. Ferguson: Judge, on behalf of the Defendant, Cleavon Fletcher, I make a Batson Motion. Out of the jury panel there were two black individuals. One was struck. My client, Mr. Fletcher, is [in] a racial minority group; [he] is a black person. We believe the prosecution exercised strikes to remove this group. On account of this — there was no valid reason for striking, and [the prosecutor is without] any reason for striking the [black] jurors, and [these strikes make a] prima facie case of discrimination.
"The Court: All right.
 "Mr. Mason: I just want to point out that the strike was the third round of strikes.
 "The Court: Okay. I see what you're saying. Okay. Not necessarily finding a prima facie case. I will ask the state to give the reasons for the record.
 "Mr. Matthews: I believe that a prima facie case hasn't been found.
 "Number 4 [Mrs. W.], if my notes show correctly, she said she went to a store that was involved on a regular basis. She said she went to one of the stores regularly.
 "The basis of my strike was she said she had a nephew that has been shot and a *Page 435 
half-brother that has been shot, and she said both of them have been prosecuted.
 "She said they got some time in jail or something like that. And I took it the way she was talking that they were not treated as courteously as they should or prosecuted as vigorously as they should have been. I just — because of those kinds of things I don't think she would be in a position to think that the state is vigorously prosecuting. And the answer that she gave is possibly that — I guess both of her family victims of crimes had not been prosecuted.
"The Court: Okay.
 "Mr. Mason: Juror Number 5 [Mr. S.] had a shooting in his family, and he was left on the jury.
 "Mr. Matthews: The way he answered the person went to prison for a period of time rather than a short period of time. I took that substantially different from somebody that had somebody — answers that she gave to questions in a murder case that she was involved and somebody was given a substantial amount of time. I see that as different in answer to the response to a crime.
"The Court: All right. Anything further?
"Ms. Ferguson: No, ma'am.
"The Court: Motions are overruled.
 "Mr. Matthews: For the purposes of the record there is on the jury one black male, Number 22, and is [C.M.] — was not struck by anyone.
"The Court: All right."
(R. 182-86.)
First, we note that in its brief the state argues that Fletcher did not make a prima facie showing of discrimination in the state's exercise of its peremptory strikes. The trial court did not expressly find that Fletcher had established a prima facie case; nevertheless, it required the state to explain its reasons for its strikes.
 " '[W]hen the trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation.' Williams v. State, 548 So.2d 501, 504 (Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989). If any of the explanations advanced by a prosecutor are deemed to be insufficient, the defendant's conviction will be reversed, even if the defendant did not establish a prima facie case. See Jackson v. State, 594 So.2d [1289] at 1292-94 [(Ala.Crim.App. 1991)]."
Taylor v. State, 666 So.2d 36, 40 (Ala.Crim.App. 1994).
 " 'The trial court evaluates an objection to the use of peremptory challenges under the three-step analysis set forth in Batson. First, as we have said, a defendant must make a prima facie showing that the state has exercised a peremptory challenge or challenges on the basis of race or gender. Second, once a prima facie showing has been made, the burden shifts to the state to articulate a race- or gender-neutral explanation for striking the prospective jurors in question that is related to the case to be tried. Batson, 476 U.S. at 98, 106 S.Ct. at 1723-24. United States Supreme Court recently stated in Purkett v. Elem, 131 L.Ed.2d 834, 514 U.S. 765, 115 S.Ct. 1769 (1995), that the second step does not demand an explanation that is persuasive or even plausible. It stated that a legitimate explanation is not necessarily one that must make sense, but one that does not deny equal protection. At this step of the inquiry, the issue is facial validity of the prosecutor's explanation, and unless a discriminatory intent is inherent in the explanation, the reason offered will be deemed neutral. Id., at 768, 115 S.Ct. at 1771. When the defendant challenges as pretextual the prosecutor's explanations as to a particular venireperson, the inquiry becomes factual in nature and moves to step three. At this step the trial court must resolve the factual dispute, and whether the prosecutor intended to discriminate is a question of fact. Hernandez v. New York, 500 U.S. 352, 364-65, 111 S.Ct. 1859, 1868-69, 114 L.Ed.2d 395 (1991). In the third step, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. At this stage, the trial court must consider the persuasiveness of the *Page 436 
explanations, and it is also at this stage that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." Purkett, 514 U.S. at 768, 115 S.Ct. at 1771.' "Bush v. State, 695 So.2d 70, 96 (Ala.Cr.App. 1995).
 "A circuit court's ruling on a Batson objection is entitled to great deference, and we will reverse such a ruling only if it is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987); Ex parte Thomas, 659 So.2d 3 (Ala. 1994); Lynn v. State, 543 So.2d 709 (Ala. 1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989)."
Talley v. State, 687 So.2d 1261, 1267 (Ala.Crim.App. 1996).
 " '[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "
Davis v. State, 555 So.2d 309, 312 (Ala.Crim.App. 1989), quoting Powell v. State, 548 So.2d 590 (Ala.Cr.App. 1988).
Applying the Purkett analysis, we hold that the state's explanations for its peremptory strikes were facially valid and race-neutral. As shown above, the codefendant's counsel asserted that a similarly situated white juror, Mr. S., had not been struck, thus raising the possibility that the state's explanations were pretextual. The trial court resolved this factual dispute against Fletcher, making no express finding of fact and, instead, simply denying his Batson motion. In the absence of an express finding, we will assume that the trial court found facts necessary to support its ruling unless the finding was " 'clearly erroneous and against the great weight and preponderance of the evidence.' " Jones v. Stedman,595 So.2d 1355, 1356 (Ala. 1992), quoting Hawk v. Biggio,372 So.2d 303, 304 (Ala. 1979). Applying the standard enunciated in Jonesv. Stedman, we cannot say that the trial court's finding would require reversal.
The record clearly shows that the reason the state gave as justification for its decision not to strike Mr. S., even though he had a family member who had been a murder victim (the justification being that Mr. S. stated during voir dire that he was satisfied with the sentence which the murderer or murderers received), was factually inaccurate. This mistake, however, does not convince us that the state's explanation for its strike of Ms. W. was a sham or pretext. There is no indication in the record that the state acted under anything but a good faith belief that Mr. S actually had commented on the sentence received by the person or persons who had murdered his cousin. The state may strike a veniremember for what proves to be a mistaken belief regarding. See Taylor v.State, 666 So.2d at 42 (a prosecutor's mistaken assessment of veniremember is not discriminatory as long as his assessment is based on "honest belief and [is] racially neutral"). It is, therefore, "logical that a prosecutor may also decide, based on mistaken belief, not to strike a veniremember." Ex parte Brown,686 So.2d 409, 420 (Ala. 1996). The trial court is in the best position to determine the credibility of the prosecution when it states its explanations for its peremptory challenges.Taylor, 666 So.2d at 42.
The evidence regarding this issue includes the following facts — (1) the state used 1 of its 11 peremptory challenges to strike Ms. W., while the defense used all of its peremptory challenges, a total of 10, to strike white jurors; (2) a black male sat on the jury; (3) Ms. W. indicated that she had heard about this crime from a co-worker, a trait not shared by Mr. S. (we note that none of the veniremembers who indicated during voir dire that they had heard about this case served on this jury); and (4) Ms. W. was also the only juror who stated that she regularly patronized one of the crime scenes, another fact distinguishing her from Mr. S. Based on this evidence, we find that the trial court's denial of Fletcher's Batson motion was not clearly erroneous.
The judgment of the trial court is affirmed.
AFFIRMED.
All the Judges concur. *Page 866