43 So.3d 7 (2009)
Robert Anthony JOHNSON
v.
STATE of Alabama.
CR-07-0965.
Court of Criminal Appeals of Alabama.
March 20, 2009.
Rehearing Denied April 10, 2009.
Certiorari Denied January 15, 2010 Alabama Supreme Court 1080914.
*9 John William Partin, Clayton, for appellant.
Troy King, atty. gen., and Jean A. Therkelsen, asst. atty. gen., for appellee.
KELLUM, Judge.
The appellant, Robert Anthony Johnson, was convicted of one count of murder, a violation of § 13A-6-2, Ala.Code 1975. He was sentenced to life imprisonment. In addition, he was ordered to pay a $2,000 fine, $10,577 in restitution, $50 to the crime victims compensation fund, and court costs.
The evidence established that on February 26, 2007, Derrick Cobb, Jr. (hereinafter "the victim"), sustained four gunshot wounds to his back at close range; he subsequently died. After receiving a dispatch call, Lt. Louis Murray, the chief investigator for the Union Springs Police Department, arrived at an apartment complex on Paskel Avenue in Union Springs where he found the victim's body. Lt. Murray testified that he immediately began conducting an investigation of the murder scene. Lt. Murray testified that shell casings from a .38-caliber pistol and a 9mm pistol were found at the scene. Lt. Murray stated that he recovered four .38-caliber shell casings and two 9mm shell casings at the scene. Based on his investigation, Lt. Murray obtained arrest warrants for Johnson and Maurice Davis.
Jelissa Robinson testified that on February 26, 2007, she her sister, Kimbreatta, and her brother were living with their aunt in an apartment on Paskel Avenue. Robinson explained that she had two children with Davis and that Johnson was Davis's brother. Robinson stated that the victim was dating her sister at the time of the shooting. Robinson testified that on the night of the shooting, Davis, who was accompanied by Johnson, showed up at the apartment to pick her up. The victim was in the apartment at the time with Robinson's sister watching television. Robinson testified that while loading bags into Davis's vehicle, she told Davis that "the *10 boy who his brother had gotten into it with" was in the apartment. Robinson testified that Davis and Johnson went into the apartment after she told them not to go inside. Robinson heard noises that sounded like "firecrackers" and saw Davis and Johnson leave the apartment. Robinson testified that Davis and Johnson ran to the vehicle and left without her. Robinson's sister, who was in the apartment at the time, exited the apartment and informed Robinson that the victim had been shot.
Kimbreatta testified that on February 26, 2007, she and the victim, whom she had been dating for four months, were watching television on the couch when Davis and Johnson walked into the apartment. Kimbreatta testified that Davis walked in first and stood at the corner of the couch on which she and the victim were sitting. Johnson walked in behind Davis carrying a.38-caliber pistol and immediately locked the front door to the apartment. Kimbreatta testified that Davis spoke to the victim and said, "[y]ou pulled a gun on my brother," and the victim responded by saying, "I ain't studying that shit like that." According to Kimbreatta, Davis "swung" at the victim; however, she was uncertain whether Davis actually made contact with the victim. Kimbreatta testified that she then put her head in her lap and heard shots fired. Kimbreatta did not see Davis with a pistol, and she was unsure whether the victim had a pistol on his person at the time of the shooting, but she testified that she did not see the victim brandish a pistol or fire a pistol. Kimbreatta testified that when she looked up, the victim had been shot, and she saw Davis kick the victim in the face before leaving the apartment. On cross-examination, Kimbreatta testified that the victim had earlier commented that he always carried a pistol with him. Kimbreatta did not know who owned the pistol she saw; she testified that the pistol was black.
The victim's parents, Marilyn Cobb and Derreck Cobb, Sr., testified that they never knew the victim to carry a pistol and had never seen the victim with a pistol. On cross-examination, Derreck Cobb, Sr., acknowledged that it was possible that the victim could have had a pistol without his knowledge.
A pistol, later identified as the .38-caliber pistol used in the February 26, 2007, shooting, was found by an employee of the Alabama Department of Transportation while he was working on Highway 29, in Bullock County. The pistol was turned over to Union Springs Police Chief Clarence Wheeler and was later submitted for analysis. Chief Wheeler testified that a second pistol, identified as a 9mm was also turned over to police during the investigation.
Adam Grooms, a firearms and tool-marks examiner with the Alabama Department of Forensic Sciences, examined the bullets removed from the victim during an autopsy performed on the victim's body, as well as the bullets and shell casings found at the scene of the crime. Grooms identified the bullets removed from the victim and found at the scene as those fired from the .38-caliber pistol recovered turned over to the police by the employee for the Alabama Department of Transportation. Grooms also determined that a bullet found at the scene was fired from the 9mm pistol retrieved by the police. Based on his analysis of both weapons, Grooms concluded that four shots had been fired from the .38-caliber pistol and that one shot had been fired from the 9mm pistol.
Quadris Johnson, Davis's and Johnson's brother, testified that he used to date Kimbreatta. According to Quadris, shortly before February 26, 2007, he and the victim had been involved in an altercation in *11 which the victim had waved two pistols at Quadris. Quadris testified that one of the pistols the victim waved at him looked like the 9 mm turned over to the police. Quadris testified that he did not tell Davis or Johnson about the incident.
Johnson testified on his own behalf at trial. Johnson testified that on the night of February 26, 2007, he went with Davis to Robinson's apartment. Johnson testified that while Davis was getting out of his vehicle to help Robinson with some bags, Robinson told him that the boy that was having problems with Quadris was inside the apartment. Johnson stated that Davis started walking toward the apartment, and Robinson screamed for Davis not to go inside because the boy had a pistol. Johnson testified that he followed Davis into the apartment because he feared for Davis's life. Johnson testified that Davis had previously informed him that the victim was the one who had pulled a weapon on Quadris.
According to Johnson, once he walked into the apartment, the victim shot Davis twice, and Davis fell to his knees. Johnson testified that the victim then held a pistol to Davis's head. Johnson stated that he then pulled his pistol out, cocked it, and shot the victim. Johnson testified that he panicked and that he did not remember pulling the trigger four times. Johnson testified that he and Davis fled in Davis's vehicle. Johnson later threw the pistol he was carrying out the window of the vehicle onto the side of the road. Johnson testified that Davis kept the 9mm pistol. Johnson identified the .38-caliber pistol found on the side of the road as the pistol he had used to shoot the victim. Johnson testified that he did not intentionally murder the victim. On cross-examination, Johnson testified that he knew that the confrontation between Davis and the victim could be ugly and that he went into the apartment because he felt Davis needed protection. Johnson testified that he shot the victim "[t]o keep him from shooting me and my brother."

I.
On appeal, Johnson, who is black, contends that the circuit court erred by denying his Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), motion. Johnson specifically contends that he made a prima facie case of racial discrimination in the jury selection procedure based on the State's decision to use all of its strikes to remove black veniremembers from the jury. Johnson also argues that the reasons given by the prosecutor for striking those particular veniremembers were either not race neutral or were not supported by information elicited during voir dire.
A defendant is required to make a "prima facie" showing of racial discrimination before the trial court will review the prosecutor's reasons for its strikes of black veniremembers. Batson, 476 U.S. at 93-94, 106 S.Ct. 1712. In the instant case, the circuit court made no express finding that a prima facie showing of racial discrimination had been made.
"[W]here a trial court has made no express finding that a prima facie case of discrimination has been established but nonetheless requires a prosecutor to explain its peremptory challenges, this court will consider such as a finding to be implied and will proceed directly to evaluate the prosecution's explanations."
Sims v. State, 587 So.2d 1271, 1276 (Ala. Crim.App.1991), cert. denied, 502 U.S. 1098, 112 S.Ct. 1179, 117 L.Ed.2d 423 (1992); see also Fletcher v. State, 703 So.2d 432, 435 (Ala.Crim.App.1997) ("`When a trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed *12 directly to evaluate the sufficiency of the ensuing explanation.' Williams v. State, 548 So.2d 501, 504 (Ala.Cr.App.1988)."). Therefore, we will assume that Johnson made a prima facie showing of racial discrimination, and we will review the prosecutor's reasons for striking the black veniremembers.
"After the appellant makes a timely Batson motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike .... See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991)." Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992). Once the prosecutor has articulated race-neutral reasons for the strike, the moving party can then offer evidence showing that those reasons are merely a sham or pretext. Ex parte Branch, 526 So.2d 609, 624 (Ala. 1987). "We will reverse the circuit court's ruling on the Batson motion only if it is `clearly erroneous.' Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989)." Cooper v. State, 611 So.2d at 463. "`"A finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."'" Fletcher, 703 So.2d at 436 (quoting Davis v. State, 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting in turn Powell v. State, 548 So.2d 590 (Ala.Crim.App.1988)).
In the instant case, the State had eight peremptory strikes. The State explained to the circuit court that it struck the first juror, E.C., because the juror had a family member that had been represented by counsel for Johnson. See Ward v. State, 539 So.2d 407 (Ala.Crim.App.1988) (upholding decision to strike potential juror based defense counsel's representation of the potential juror's son). The State struck the second juror, W.P., because he had been charged with domestic violence and his wife was related to a witness in another case. See Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992) (finding previous criminal charges, prosecutions, or convictions of potential jurors or their relatives to be a race-neutral reason for striking them). G.R. and T.T., the third and fourth potential jurors struck by the State were struck because one was related to a defendant in a nonjury case being tried later that same day and the other was related to someone convicted of robbery. See Thomas v. State, supra. The State used its fifth strike to remove R.R. because the State thought he lacked mental acuity. See Blanton v. State, 886 So.2d 850 (Ala.Crim.App.2003) (recognizing that a potential juror's inability to keep track of proceedings because of mental impairment is a valid race-neutral reason for striking the potential juror). The State struck a sixth potential juror, J.M., because, among other things, he had previously sat on a jury that had acquitted the defendant. See Childers v. State, 607 So.2d 350 (Ala. Crim.App.1992) (holding as race-neutral a strike of a potential juror who had previously had served on a jury that returned a not-guilty verdict). Finally, the State struck M.O. based on her familial relationship with a witness for the defense. See Wilsher v. State, 611 So.2d 1175 (Ala.Crim. App.1992) (holding fact that veniremember knows or is acquainted with witnesses subpoenaed by the defense is race-neutral reason for striking veniremember). The reasons for striking the potential jurors were based on considerations other than race. Further, the State agreed to allow one of the stricken jurors to be placed back on the jury at Johnson's request. Given the circumstances, the circuit court's decision to deny Johnson's Batson challenge was not clearly erroneous.

*13 II.
Johnson further contends on appeal that the evidence presented at trial was insufficient to support his conviction for intentional murder. Specifically, Johnson argues that the State failed to rebut his evidence that he acted in self-defense; that the evidence did not support a conclusion that Johnson intended to cause the death of the victim; and that the jury's verdict was against the weight of the evidence and failed to consider the totality of the circumstances.
"`In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
"`....
"`"The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala. 1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger [v. State], 473 So.2d [1137,] 1139 [(Ala.Crim.App.1985)].
"... `Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017 (Ala. Crim.App.1989).
The evidence, both direct and circumstantial, was sufficient to support the jury's finding that Johnson was guilty of murder. Section 13A-6-2(a)(1), Ala.Code 1975, provides, in pertinent part, that "[a] person commits the crime of murder if ... [w]ith intent to cause the death of another person, he or she causes the death of that person...." Testimony presented at trial indicated that Johnson, who was carrying a loaded pistol, followed Davis into the apartment. Kimbreatta testified that Johnson immediately locked the front door *14 when he entered the apartment and that, shortly thereafter, she heard gunshots. Johnson admitted to shooting the victim; however, he testified that the shooting was not intentional. The question of Johnson's intent to kill the victim is a matter to be determined by the jury. Paige v. State, 494 So.2d 795, 796 (Ala.Crim.App.1986). The record contains sufficient evidence from which the jury could have concluded that Johnson had the requisite intent to kill the victim on the evening of February 26, 2007.
Johnson also testified that he shot the victim in defense of himself and Davis. Regarding his claim that the State failed to rebut his evidence that he acted in self-defense, this court has held that in order to sustain a claim of self-defense, it is necessary to establish: "`"(1) that the accused was in actual or apparent peril; (2) that the accused was unable to retreat; and (3) that the accused was free from fault in bringing on the difficulty."'" Peraita v. State, 897 So.2d 1161, 1211 (Ala. Crim.App.2003) (quoting Moore v. State, 659 So.2d 205, 208 (Ala.Crim.App.1994)). "Further, the question of whether the appellant was in actual or apparent immediate peril so as to justify the use of physical force in self-defense is a question of fact to be decided by the jury, after appropriate instruction by the court as to the application of the term." Moore, 659 So.2d at 208 (citing Lemley v. State, 599 So.2d 64, 74 (Ala.Crim.App.1992)). In the instant case, the jury concluded that the evidence presented at trial did not establish that Johnson acted in self-defense. We will not substitute our judgment for that of the jury. See Moore, supra. Viewing the evidence in the light most favorable to the State, we conclude that the State presented sufficient evidence from which the jury could have reasonably concluded that Johnson committed murder, as defined by § 13A-6-2(a)(1), Ala.Code 1975.

III.
Finally, Johnson argues on appeal that the circuit court erred by denying his motion for a change of venue. The record indicates that before the trial of this matter Johnson filed a motion for a change of venue in which he alleged that major newspapers, television stations, and radio stations had covered the victim's murder extensively and that such pre-trial publicity had created an "inherently prejudicial atmosphere, making the selection of a fair and impartial jury impossible." At a pretrial hearing on Johnson's motion for a change of venue and before voir dire, the court stated as follows:
"[A]t this point, I think what I would do is talk to the venire about pretrial publicity, about things that have been in the paper. If we get into a situation where you are requesting some individual voir dire of those people that might remember or hear or had heard something about this case, we'll take that up at that time.
"I'm certainly not going to put him to trial if the venire out there is tainted to such an extent that I don't think he can get a fair trial.
"And I want to caution you both about this: Since there have been articles in the newspaper, I'll do some questioning about those articles, not specific because I don't want to taint the remaining jurors that have not read it. And I'll give you a chance to make more of a record of it if you need to."
Following voir dire, counsel for Johnson did not renew his motion for a change of venue, and the circuit court made no further mention of Johnson's motion for a change of venue.

*15 "This court will not review the merits of a motion presented by the appellant at trial unless the court below has issued a ruling adverse to the appellant on the motion. Knight v. State, 623 So.2d 376, 379 (Ala.Cr.App.1993). It is the appellant's duty to preserve the record for appeal by invoking a ruling from the trial court. White [v. State], 589 So.2d [765] at 766 [(Ala.Crim.App.1991)]."
Berryhill v. State, 726 So.2d 297, 302 (Ala. Crim.App.1998).
Our review of the record indicates that the circuit court did not issue an adverse ruling with regard to Johnson's motion for a change of venue. The circuit court's statement quoted above regarding the motion for a change of venue does not expressly deny Johnson's motion. Rather, it suggests that the circuit court took the motion under advisement until voir dire had been concluded. Therefore, this issue has not been preserved for appellate review.
Despite Johnson's failure to preserve this issue for appeal, our review of the record indicates that he failed to establish that a change of venue was warranted in this case.
"`The granting of an accused's motion for a change of venue rests in the sound discretion of the trial court, and its ruling thereon will not be disturbed except for gross abuse.'" Mullis v. State, 545 So.2d 205, 209 (Ala.Crim.App.1989) (citing Knighten v. State, 507 So.2d 1015, 1021 (Ala.Crim.App.1986)). Widespread publicity, alone, will not support a change in venue. Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Leonard v. State, 551 So.2d 1143, 1149 (Ala.Crim.App.1989).
"The appellant must establish that he has been prejudiced by the pretrial publicity by presenting evidence that, given the facts and circumstances, it would be practically impossible to secure an impartial jury. Mullis, 545 So.2d at 208; Kennedy v. State, 472 So.2d 1092, 1095 (Ala.Crim.App.1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). `The accused must affirmatively show that pretrial publicity has so saturated the community as to have a probable impact on the prospective jurors or that there is a connection between publicity generated and the existence of actual juror prejudice.' Mullis, 545 So.2d at 208."
Sockwell v. State, 675 So.2d 4, 15 (Ala. Crim.App.1993).
In the instant case, in addition to the minimal content in his motion for a change of venue, Johnson argued before the court that the local area was small and "thinly populated." Johnson stated that, shortly after his arrest, the local newspaper published an article featuring a photograph of him. Johnson contended that the article was highly prejudicial, and, thus, he felt like he could not get a fair trial in Bullock County. In light of Johnson's motion and the argument made by Johnson before the court, we cannot say that the circuit court abused its discretion in denying Johnson's motion for a change of venue.
Based on the foregoing, the judgment of the circuit court is affirmed.
AFFIRMED.
WISE, P.J., and WINDOM, J., concur.
WELCH, J., concurs specially, with opinion.
WELCH, Judge, concurring specially.
I concur fully with the main opinion. I write to address Johnson's belief that, in the context of a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 *16 (1986), the racial-neutrality of a proponent's peremptory strike must be disclosed during voir dire. In several instances, Johnson rebutted the State's alleged race-neutral explanation for a challenged strike by arguing that the voir dire did not support the State's explanation, i.e., "[the State] should have elicited that in the voir dire"; "[the State] should have brought the sheriff on to testify ... [i]t is not in the record in this voir dire"; and "nothing was brought out in the voir dire about [K.N.]." (R. 111-122.)
The Alabama appellate courts' scrutiny of a proponent's explanation for a peremptory strike has changed over the years. The appellate courts' review of the State's explanations was, in the early years after Batson was decided, relaxed. See Ex parte Jackson, 516 So.2d 768, 772-73 (Ala. 1986) (noting that strike is race-neutral "`[i]f the party shows that the challenges were based on the particular case on trial, the parties or witnesses, or characteristics of the challenged persons other than race'" (emphasis added) (quoting State v. Neil, 457 So.2d 481, 487 (Fla.1984)), but also noting that "[n]o merely whimsical or fanciful reason will suffice as an adequate explanation [for a peremptory strike]"); Scales v. State, 539 So.2d 1074, 1075 (Ala. 1988) ("[T]he reasons given by the prosecutor for using his strikes ... were facially race neutral. The trial judge found them to be credible. No more is required under Batson."); Stephens v. State, 580 So.2d 11, 20 (Ala.Crim.App.1990) ("`"[T]he vagarious process of choosing jurors need not be controlled by a simple equation; it may be influenced by intuitive assumptions that are not fatally suspect merely because they are not quantifiable... and by the interplay of various factors."'" (quoting other cases.)); Smith v. State, 590 So.2d 388, 390 (Ala.Crim.App. 1991) ("A trial court's Batson findings largely turn on an evaluation of credibility. A prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral."); Jones v. State, 611 So.2d 466, 468, 470 (Ala.Crim.App.1992) (upholding as race-neutral prosecution's peremptory strike on the "ground that the sheriff's department had had `drug problems' with that person and reasoning that, `[h]ere, there was more than the "mere suspicion" of relationship'"). But see, Ex parte Branch, 526 So.2d 609, 624 (Ala.1987) ("[T]rial judge must make a sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he knows them, his knowledge of trial techniques, and his observation of the manner in which the prosecutor examined the venire and the challenged jurors" and "[t]he trial judge cannot merely accept the specific reasons given by the prosecutor at face value ... the judge must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination." (citing People v. Hall, 35 Cal.3d 161, 168, 672 P.2d 854, 858-59, 197 Cal.Rptr. 71, 75 (1983), and Slappy v. State, 503 So.2d 350, 356, (Fla. Dist.Ct.App.1987))); Ex parte Bird 594 So.2d 676, 679, 683 (Ala.1991) (prosecutor's "`gut feeling' about a veniremember," without more, will not successfully rebut a prima facie discrimination, nor will a "prosecutor's self-imposed ignorance preclude a Batson claim").
On May 15, 1992, the Alabama Supreme Court released Ex parte Thomas 601 So.2d 56 (Ala.1992). Quoting Ex parte Bird, 594 So.2d at 679, the Thomas Court stated that the State has "`the burden of articulating a clear, specific, and legitimate reason for the challenge that relates to the particular case to be tried and that is nondiscriminatory.'" Ex parte Thomas, 601 So.2d at 58. "Furthermore," the Thomas Court continued, citing Branch,

*17 "[t]he trial court cannot merely accept the specific reasons given by the prosecutor at face value. [Ex parte Branch, 526 So.2d at 624.] Rather, the court must consider whether the facially neutral explanations are contrived to avoid admitting acts of group discrimination. Id."
Ex parte Thomas, 601 So.2d at 58 (emphasis added).
The Thomas Court explained: "Extremely significant in this case, and at the heart of the reason this case must be reversed, is the trial court's accepting at face value the State's ostensibly facially neutral explanations for the use of its peremptory challenges, which were, with regard to three of the black veniremembers who were struck, based exclusively on information contained in the document to which only the State had access." Ex parte Thomas, 601 So.2d at 58-59 (emphasis added). Later cases did not consider the context of Thomas decision, but cited Thomas as authority requiring that a peremptory strike be supported by objective facts contained in the record. See Bush v. State, 615 So.2d 137, 140 (Ala.Crim.App. 1992) (citing Thomas, 601 So.2d at 58, for the proposition that "`[t]he trial court cannot merely accept the specific reasons given by the prosecutor at face value'" and holding that "[t]he reasons for the prosecution's strikes must be supported by the record. Unsupported allegations are not sufficient to prove that strikes were made for race-neutral reasons."); Walker v. State, 611 So.2d 1133, 1140 (Ala.Crim.App. 1992) ("A prosecutor cannot simply presume, without further questioning to `dispel any doubt,' that a veniremember, who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary," and cases cited therein, i.e., Guthrie v. State, 598 So.2d 1013 (Ala.Crim.App.1991), Harrell v. State, 571 So.2d 1270, 1272 (Ala. 1990), Jackson v. State, 557 So.2d 855, 856 (Ala.Crim.App.1990), Avery v. State, 545 So.2d 123, 127 (Ala.Crim.App.1988), Floyd v. State, 539 So.2d 357, 362 (Ala.Crim.App. 1987)). See also Williams v. State, 620 So.2d 82, 85 (Ala.Crim.App.1992) ("[T]he reason given for striking prospective juror... [was] not a sufficient ground for a strike, and so [was] not considered to be a race neutral reason" because this information was "`based exclusively on information not in any way verifiable on the record before us.'"). Compare, Ex parte McNair, 653 So.2d 353, 357 (Ala.1994) ("[W]e refuse to extend the holding in Thomas to require a prosecutor, in every case where a Batson objection has been made, to provide an evidentiary foundation for each peremptory strike used against a black member of the venire (e.g., testimony from victims, police officers, or any other individual who may have supplied information about a member of the venire that the prosecutor believes in good faith to be true).").
In 1995 the United States Supreme Court issued Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Purkett lessened the State's burden to prove that peremptory strikes were race-neutral. Purkett held that a race-neutral explanation "does not demand an explanation that is persuasive, or even plausible .... `[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" 514 U.S. at 768, 115 S.Ct. 1769. Purkett was not embraced by the Alabama Supreme Court. See Ex parte Bruner, 681 So.2d 173 (Ala.1996) (writ of certiorari quashed as improvidently granted, but Justice Cook, concurring specially, wrote that Purkett was inappropriate as "a retreat from the standard declared in Batson."); *18 Bishop v. State, 690 So.2d 502, 504 (Ala.Crim.App.1996) ("[T]he Alabama Supreme Court has recently emphasized that the rule in Alabama differs substantially from the rule set out in Purkett," citing Ex parte Bruner, supra); Ex parte Weaver, 682 So.2d 493, 493 (Ala.1996) (Houston, J., concurring specially) (noting that "the majority of this Court refuses to allow Purkett v. Elem to control Alabama's peremptory challenge procedure" and citing Ex parte Bruner, supra); Looney v. Davis, 721 So.2d 152, 164, n. 3. (Ala.1998) ("[R]egarding the scrutiny that a trial court is to apply to reasons offered by a proponent of a peremptory strike, we adhere to the Alabama standard declared in Ex parte Branch."); Smith v. Jackson, 770 So.2d 1068, 1073-74 (Ala.2000) (State's strike "was based on `intuitive judgment or suspicion' and did not constitute a legitimate, race-neutral reason for the peremptory strike"). Compare, Ex parte Drinkard, 777 So.2d 295, 306 (Ala.2000) (noting that in reviewing a Batson challenge "`[t]he trial judge cannot merely accept the specific reasons given by the prosecutor at face value; the judge must consider whether the racially neutral explanations are contrived to avoid admitting acts of group discrimination'"; nevertheless, that Court affirmed the judgment of the trial court, finding its ruling not to be clearly erroneous); Smith v. State, 838 So.2d 413, 436 (Ala.Crim.App.2002) ("[T]he prosecutor came forward with a facially neutral explanation for striking [the] potential jurors." "`"`[A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.'"'" (quoting other cases)).
In Tomlin v. State, 909 So.2d 213, 247 (Ala.Crim.App.2002), this court's mention of Purkett suggested that Alabama has not closed the door on its application. See Tomlin v. State, 909 So.2d at 247 ("There is no evidence indicating that the trial court abused its substantial discretion in denying the Batson motion. Moreover, applying the federal law announced in Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), we can find no Batson violation."), rev'd on other grounds, Ex parte Tomlin, 909 So.2d 283 (Ala.2003). Then in 2009 this Court released Smith v. State, [Ms. CR-97-1258, January 16, 2009] ___ So.3d ___, ___ (Ala.Crim.App.2009) (opinion on return to fourth remand), wherein the Batson challenge was reviewed pursuant Purkett. Citing Purkett, we stated that the State's explanation does not have to be
"persuasive, or even plausible.... `[T]he issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' ... Purkett v. Elem, 514 U.S. 765, 767-68 ... (1995). `A "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.' 514 U.S. at 769."
681 So.2d 173.
Therefore, the latest statement of the law regarding a Batson challenge provides that, to suffice, an explanation for a peremptory strike need only lack inherent discriminatory intent. There is no requirement that the voir dire must establish the racial-neutrality of a peremptory strike. Therefore, Johnson's sole reliance on the voir dire to show that the State struck potential jurors in a racially discriminatory manner is misplaced.