ON RETURN TO REMAND
On January 13, 1995, this court remanded this case to the trial court for an evidentiary hearing to determine whether the appellant, Christopher Bishop, made a prima facie showing of racial discrimination in the exercise of its peremptory strikes. We held that the trial court had incorrectly found that the appellant had to show a history of discriminatory striking of juries by the district attorney in order to make a prima facie showing of discrimination. We also cautioned the trial court that it could not rely solely on the fact that a greater percentage of blacks sat on the jury than were on the venire in determining whether the appellant has made a prima facie showing of discrimination.
At the remand hearing, defense counsel made the following argument:
 "My records show that at the time of the actual striking of the jury that there were fourteen blacks left on the panel, two having been, I believe, excused for cause. Of those fourteen blacks, nine were struck by the State, two were struck by the Defendant and three remained on the jury. *Page 499 
 "Now, what I have done is kind of categorized the — of the nine black members of the panel that were struck by the State in their responses to the questions that were asked on voir dire. Juror number twenty, E.L., was the State's twenty-first strike. E.L. responded to no questions during the entire voir dire. Juror number sixty-one, F.H., was the State's thirteenth strike. She responded to no questions during the entire voir dire.
 "Juror number thirty-five, M.P., was State's strike eight. He responded through the entire voir dire to one question advising the Court through the prosecution's question or my question — I don't remember exactly which — on page eight-one of the transcript, that he knew the Finneys, which were the victim's family, from Little League and, other than that responded to no questions. And that was M.P. who was State's strike eight.
 "Juror number thirty-three was B.P. He responded — He was State's strike twenty-one. He responded to only one question and it was the same question, that he was familiar with members of the Finney family. Juror number fifty-three, J.W., responded on page eighty-four of the transcript that — all the voir dire, he answered to two question, one being that he had served on a previous jury and another being that he had served on a previous Grand Jury and answered no other questions during the voir dire.
 "Juror number four, P.C, was State's strike fourteen. I'm sorry. Let me — I don't know if I did — J.W. was — was defense strike sixteen. He was not a State's strike. He was a defense strike. Juror P.C. was State's strike fourteen. P.C. responded to only three questions on voir dire; one, that she knew Benny Colvin, one, that she knew the victim's family; and one, that she had heard something about this case in the community. She responded to no other questions. She was State's strike fourteen.
 "J.G. of Millport, number twelve, was State's strike seventeen. He responded to only one question which was that he had served on a prior jury. Juror number forty-one, M.R., was State's strike nineteen. She responded to a number of questions on voir dire. She responded that she knew the Defendant because he had delivered furniture to her home, that she had been represented previously by James Moore on a matter, that she knew the victim personally, that she knew the Finney family and that she had heard about the situation. She was State's strike nineteen.
 "Juror forty-seven, K.S., was State's strike four. She responded to a number of questions, those questions being that she also knew the Defendant in the case because she had seen him at where he worked. She knew his girlfriend, M.K. just by sight. She said her brother-in-law was in law enforcement. She knew of the Finney family. She had heard about this and later testified — stated that she knew Chris and Melissa only to see them, but did not know them personally and had only seen them around.
 "Juror number fifty-two, S.W., was State's strike two. S.W. testified or answered on voir dire a number of questions, also stating that she knew the Defendant because he worked at Spillers, stating that she knew Melissa King from high school, stating that she heard about the case. She had known the victim. She knew the Finney family. She had heard about the case and she testified extensively about her religious views in the individual questioning of the jurors. She was State's strike two.
 "Now, Your Honor, those constitute the nine strikes that the State used on Black jurors. We would submit to you that in particular as to jurors number twenty and sixty-one, where there was no information elicited on voir dire, there can be no other explanation except race for the basis of their strikes. I would submit that on jurors thirty-five and thirty-two, the only information that was elicited from them on voir dire was that they knew the Finney family and that would not be a basis in and of itself to strike by the State since that's in the victim's family.
 "I would submit that juror seventeen, whose only response was that he had *Page 500 
served on a previous guilty [sic] would be insufficient as a race neutral — It was a criminal case, as a matter of fact, that same jury session — would be insufficient as a race-neutral reason with no other reason given to support that strike.
 "The other jurors that were struck by the prosecution answered a variety of questions which were answered by the actual jurors who served in the same — in the same manner. A number of jurors who served stated that they were — they knew Benny Colvin, as did juror number four, P.C. A number of the jurors who served stated that they knew the victim or the victim's family. A number of the jurors who served stated that they had heard about the case.
 "There appears to be nothing to distinguish these jurors from the other jurors who actually served on the case or were not struck by the State other than the fact that they are black."
At the end of the hearing, the trial judge merely stated that a prima facie showing had not been made and the Batson motion was denied.
 "In Ex parte Branch, 526 So.2d 609 (Ala. 1987), the Alabama Supreme Court set forth guidelines for considering a Batson motion. The initial burden is upon the party alleging a discriminatory use of peremptory challenges to establish a prima facie case of discrimination. The following evidence can be used to raise the inference of discrimination: evidence that the blacks stricken — other than the fact they were black — were as heterogenous as the community as a whole; a pattern of strikes against black jurors on a particular venire; the past conduct of the State's attorney in using peremptory challenges to strike all black veniremembers; the questions of the State's attorney during voir dire, including nothing more than desultory voir dire; the questions propounded to the challenged veniremember during voir dire, including a lack of questions or meaningful questions; disparate treatment of white members of the venire with the same characteristics as the challenged black members; and evidence that the State used peremptory challenges to dismiss all or almost all of the blacks from the jury. Id. at 622-23."
Sockwell v. State, 675 So.2d 4 (Ala.Crim.App. 1993). After a thorough review of the record on return to remand, the voir dire of the jury, and the examination of some of the strikes made by the State and some of the jurors who were not struck by the State, we must conclude that the appellant made a prima facie showing of discrimination.
From our review of the record and the evidence presented at the hearing on remand, we hold that the appellant met his burden of making a prima facie showing of discrimination in this case. The State used 9 of its 14 strikes to remove blacks from the venire. Several of the black jurors who were struck shared characteristics with white jurors who were not struck and we can find no reason for striking these jurors other than their race. Two of the jurors who were struck stated that they knew the victim's family. Generally, these jurors would be perceived to be favorable to the State. The only answers these two veniremembers gave during the entire voir dire related to their knowing the victim's family. That is the only reason we can discern from the record for striking these jurors. However, several jurors who were seated on the jury also stated they knew the victim's family. Such disparate treatment of otherwise similarly situated persons, who happen to be of different racial backgrounds, would evidence discriminatory intent in the State's use of its strikes. See Ex parte Branch, 526 So.2d 609,623-24 (Ala. 1987); Ex parte Bird, 594 So.2d 676 (Ala. 1991);Meads v. RPM Pizza, Inc., 639 So.2d 1352 (Ala. 1994). This court has condemned the failure to strike white venirepersons who share the same characteristics as black venirepersons who were struck. See Carrick v. State, 580 So.2d 31
(Ala.Crim.App. 1990); Acres v. State, 548 So.2d 459 (Ala.Crim.App. 1987); Powell v. State, 608 So.2d 411 (Ala.Crim.App. 1992).
One of the jurors answered that he had previously served on a jury. Because this is the only response by this veniremember, and, it is the only reason we can find for the State's strike for this particular person. However, the State did not strike *Page 501 
several other jurors who also indicated that they had previously served on a jury. The State never asked these jurors what the verdict was in the cases in which the jurors served, so there was no basis for determining that the struck veniremember was pro-defense or pro-prosecution. Again, this is evidence of disparate treatment. Further, there was "a lack of questioning to the challenged juror, or a lack of meaningful questions" regarding this juror's previous jury service. Exparte Branch, 526 So.2d 609, 624 (Ala. 1987). See also Jacksonv. State, 557 So.2d 855, 856 (Ala.Crim.App. 1990). We also have problems with the State's striking of another black juror who never answered a question during voir dire and we, therefore, cannot determine from the record why she was struck.
 "The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31 (Ala.Cr.App. 1992); Jackson v. State, 594 So.2d 1289, 1294 (Ala.Cr.App. 1991). 'It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is "clearly erroneous." ' Ex parte Bankhead, 625 So.2d 1146 (Ala. 1993)."
Merriweather v. State, 629 So.2d 77 (Ala.Crim.App. 1993).
With due deference to the trial court, we must find that the trial court's ruling that the appellant did not present a prima facie case of discrimination with regard to the State's use of its peremptory strikes was clearly erroneous. Therefore, this cause is remanded to the trial court with instructions that an evidentiary hearing be held at which the State shall be required to give reasons for all its strikes of black jurors. If the State shall fail to give race-neutral reasons for its strikes, then the appellant shall be entitled to a new trial. A return to remand shall be filed with this court within 70 days of this opinion. The return shall include a transcript of the proceedings and the court's written findings as to the State's reasons for its strikes.
REMANDED WITH INSTRUCTIONS.*
All the Judges concur except TAYLOR, P.J., who dissents with opinion.
* Note from the reporter of decisions: On May 10, 1996, on return to remand, the Court of Criminal Appeals affirmed, without opinion.