KELLUM, Judge,
dissenting.
I must dissent from the majority’s holding that the trial court did not err in denying Sharp’s motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). After thoroughly reviewing the record, I have no choice but to conclude that all the reasons given by the State for striking Jurors no. 27 and 11 were pretextual and thus improper under Batson.
As the majority recognizes, in evaluating a Batson claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson,] 476 U.S., at 96-97. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.
*376 Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.”
In this case, the majority correctly concludes that Sharp satisfied the first step of the process — establishing a prima facie case of discrimination. The Supreme Court held that the record in this case raised an inference of discrimination. Ex parte Sharp, 151 So.3d 829 (Ala.2009). The majority also correctly concludes that the State satisfied the second step of the process — providing facially race-neutral reasons for its strikes. As the majority notes, all the reasons given by the State for its strikes of African-American jurors were based on something other than the juror’s race, and both this Court and the Alabama Supreme Court have specifically recognized as race neutral the various reasons asserted by the State here.
It is with the majority’s conclusion that Sharp failed tp satisfy his burden under the third step of the process — establishing purposeful discrimination — that I must disagree. In the third step of the Batson process, the burden is on the defendant to establish that the State’s asserted reasons for its strikes were pretextual and, thus, discriminatory.
“Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People v.] Wheeler, 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 Cal.Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the . challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck....
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors....
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire....
“6. ‘An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State], 503 So.2d [350] at 355 [ (Fla.Dist.Ct.App.1987) ]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
Ex parte Branch, 526 So.2d 609, 624 (Ala. 1987). “ ‘The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor’s other peremptory strikes, and as well, in light of the strength of the prima facie case.’” Ex parte Bird, 594 So.2d 676, 683 (Ala.1991) (quoting Gamble v. State, 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987)). In other words, all relevant circumstances must be considered in determining whether purposeful discrimination has been shown. See, e.g., Snyder v. Louisiana, 552 U.S. 472, 478, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (“[I]n review *377 ing a ruling claimed to be a Batson error, all of the circumstances that bear upon the issue of racial animosity must be consulted”).
Although the majority cites Ex parte Bird, supra, and Snyder, supra, for the proposition that all relevant circumstances, including the other reasons proffered by the State for its strikes, must be considered in determining whether any one reason proffered by the State is pretextual or non-pretextual, the majority does not follow that law in determining that the State’s strikes against Jurors 27 and 11 are non-pretextual. Rather, the majority, relying on Martin v. State, 62 So.3d 1050 (Ala.Crim.App.2010), an opinion I authored, and the cases cited therein, rejects Sharp’s argument that all relevant circumstances must be considered.
In Martin, writing for the Court, I explained the general rule in Alabama as follows:
“It is well settled that ‘[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.’ Johnson v. State, 648 So.2d 629, 682 (Ala.Crim.App.1994). See also Jackson v. State, 791 So.2d 979, 1009 n. 6 (Ala.Crim.App.2000); Brown v. State, 705 So.2d 871, 874 (Ala.Crim.App.1997); and Wood v. State, 715 So.2d 812, 816 (Ala.Crim.App.1996), aff'd, 715 So.2d 819 (Ala.1998). “Where a prosecutor gives a reason which may be a pretext, ... but also gives valid additional grounds for the strike, the race-neutral reasons will support the strike.’ Battle v. State, 574 So.2d 943, 949 (Ala.Crim.App.1990).”
Martin, 62 So.3d at 1059-60.[20] In other words, the general rule is that once a court determines that one specific reason proffered by the State for a challenged peremptory strike is both race neutral and non-pretextual, it is unnecessary for the court to make a determination as to whether any of the other reasons proffered by the State for that strike are also race neutral and non-pretextual. However, it is in making the determination whether that one specific reason proffered by the State is pretextual or non-pretextual that a court is required to consider all relevant circumstances, including the other reasons proffered by the State for that particular strike and the reasons proffered by the State for its other strikes. Neither Martin nor the general rule as cited in Martin say otherwise. Thus, in determining whether any one reason proffered by the State for its strikes of Jurors no. 27 and 11 is pretextual or non-pretextual, I consider, as I did in Martin, all the relevant circumstances, including the other reasons proffered by the State for those strikes and the reasons proffered by the State for its other strikes.
“Under Alabama law, the trial judge must ‘evaluate] the evidence and explanations presented’ and ‘determine whether the explanations are sufficient to overcome the presumption of bias.’ Branch, 526 So.2d at 624. ‘The trial judge cannot merely accept the specific reasons given ... at face value; the judge must consider whether the facially neutral explanations are contrived to avoid admitting the acts of group discrimination.’ Id.”
*378 Smith v. Jackson, 770 So.2d 1068, 1072-73 (Ala.2000) (emphasis added). “[T]he proponent’s explanations — even if facially neutral — are not viewed by the judiciary with credulous naivete.” Ex parte Bruner, 681 So.2d 173,179 (Ala.1996) (Cook, J., concurring specially). “[T]he critical question in determining whether a [defendant] has proved purposeful discrimination at step three is the persuasiveness of the prosecutor’s justification for his peremptory strike. At this stage, ‘implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.’ ” Cockrell, 537 U.S. at 339 (quoting Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)).
As the majority correctly observes, because “ ‘[t]he trial court is in a better position than the appellate court to distinguish bona fide reasons from sham excuses,’ ” Harris v. State, 2 So.3d 880, 899 (Ala.Crim.App.2007) (quoting Heard v. State, 584 So.2d 556, 561 (Ala.Crim.App.1991)), an appellate court must give deference to a trial court’s findings and “ ‘reverse the circuit court’s ruling on the Batson motion only if it is “clearly erroneous.” ’ ” Johnson, 43 So.3d at 12 (quoting Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992), quoting in turn Jackson v. State, 549 So.2d 616, 619 (Ala.Crim.App.1989)). However, contrary to the belief expressed by the majority, “[djeference does not by definition preclude relief.” Cockrell, 537 U.S. at 340. Rather, “ ‘ “[a] finding is ‘clearly erroneous’ when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” ’ ” Fletcher v. State, 703 So.2d 432, 436 (Ala.Crim.App.1997) (quoting Davis v. State, 555 So.2d 309, 312 (Ala.Crim.App.1989), quoting in turn Powell v. State, 548 So.2d 590, 594 (Ala.Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989)). In this case, I am left with a definite and firm conviction that a mistake has been made with respect to Jurors no. 27 and 11.
As the majority notes, after challenges for cause, there were 71 jurors on the venire, of which 14, or approximately 20 percent, were African-American. The prosecutor struck 11, or approximately 79 percent, of those eligible African-American jurors. The defense struck two African-American jurors, and only one African-American juror sat on Sharp’s jury. “Happenstance is unlikely to produce this disparity.” Cockrell, 537 U.S. at 342. In its opinion, the Alabama Supreme Court found — under the stringent plain-error standard of review[21] — that the record indicated that some African-American jurors who were struck provided responses to questions similar to the responses of Caucasian jurors who were not struck and that the record indicated that the African-American jurors who were struck shared the characteristic of race but were otherwise heterogenous. Under these circumstances, the prima facie case of discrimination is strong, and I must consider the reasons for striking Jurors no. 27 and 11 in light of that strong prima facie case.
On remand, the State proffered three reasons for striking Juror no. 27, set out in the order in which the State proffered the reasons: (1) her employment as a packer *379 on an assembly line at a Target Distribution Center and her previous employment at a Burger King fast-food restaurant indicated that she lacked “sophistication”; (2) on question 79 on the juror questionnaire, asking, “If you’ve heard anything in the media regarding this case, do you feel you could still be fair and impartial?” she circled “no”; and (3) she had been charged in Madison County with six counts of possession of marijuana in the second degree and “[i]t appeared” to the State that she had been convicted of one of those counts in 1990, a time when the prosecutor had been exclusively a drug prosecutor for the district attorney’s office. The State proffered the following reasons for striking Juror no. 11, also set out in the order in which the State proffered them: (1) she was a Seventh Day Adventist; (2) she was then unemployed, had no employment history over the last 10 years, and indicated on the juror questionnaire that she did not know her ex-husband’s place of employment; (3) she did not answer question 79 on the juror questionnaire and did not “fully” answer question 74; and (4) she had a prior conviction for issuing a worthless check. I first address those reasons the State proffered for striking both Juror no. 27 and Juror no. 11 — “lack of sophistication,” alleged prior convictions, and answers or lack thereof on the juror questionnaires— and then turn to the remaining reason the State proffered for striking Juror no. 11— that she was a Seventh Day Adventist.
I.
The State proffered as its “first and foremost” reason for striking Juror no. 27 that she lacked “sophistication” because she worked as a packer and proffered as a reason for striking Juror no. 11 that she was unemployed and lacked knowledge of her ex-husband’s employment. The State first used “lack of sophistication” as a reason for its strike against Juror no. 37, the second African-American it struck, who was a custodian. In doing so, the State explained: “[T]he Court is well aware that this was a circumstantial case that really the thrust of the State’s evidence was DNA evidence, as the Court knows is somewhat sophisticated and technical evidence. So his sophistication socially or professionally was noted by the State.” The State noted later that “with respect to professional or social sophistication ... one of the main concerns of the State in this case [was] to, in fact, get a jury that could comprehend DNA evidence.” Thus, it appears that the State was using the term “sophistication” as a synonym for “intelligence” and that it believed that Juror no. 27 was not sufficiently intelligent to understand DNA evidence. In addition, although the State did not specifically assert that Juror no. 11 lacked “sophistication” as it did with Juror no. 27, it is clear that the State’s reasoning was the same for both jurors. The State referred to Juror no. ll’s unemployment and her lack of knowledge of her ex-husband’s employment “in light of the evidence we were presenting,” thus showing that it also believed Juror no. 11 was not sufficiently intelligent to understand DNA evidence.
The majority dismisses the State’s heavy reliance on “lack of sophistication” as a reason for striking several potential jurors largely because, it concludes, the trial court did not rely solely on that proffered reason in determining whether there was purposeful discrimination, but instead “cited other race-neutral reasons the State offered for striking” several jurors. 151 So.3d at 365. Although I do not necessarily agree with the majority’s interpretation of the trial court’s order, even assuming that interpretation to be correct, the trial court’s, and now the majority’s, failure to consider the State’s heavy reliance on lack of intelligence as a reason for striking *380 several African-American jurors ignores the settled law, as explained above, that all relevant circumstances bearing on the issue of racial animosity, including the State’s proffered reasons for its other strikes, must be considered when reviewing a trial court’s ruling on a Batson motion. See Snyder v. Louisiana, 552 U.S. at 478, and Ex parte Bird, 594 So.2d at 688.
Although, as noted above, low intelligence is a facially race-neutral reason for a peremptory strike, it is nonetheless a suspect reason because of the inherent susceptibility of abuse. See McGahee v. Alabama Dep’t of Corr., 560 F.3d 1252, 1265 (11th Cir.2009) (“[T]he State’s claim that several African-Americans were of ‘low intelligence’ is a particularly suspicious explanation given the role that the claim of ‘low intelligence’ has played in the history of racial discrimination from juries.”). In this case, the reason is even more suspect because it is unsupported by the record and is based solely on a group bias. Indeed, the trial court found this reason to be suspect with respect to Jurors no. 37, 39, 52, 11, 38, and 74, noting at various points in its order that the record did not support the State’s conclusion that some of these jurors lacked the intelligence necessary to understand DNA evidence and that a person’s employment status alone is not sufficient to establish a lack of intelligence. Although the trial court did find this reason to be supported by the record with respect to Jurors no. 27 and 47, that finding by the trial court is itself unsupported by the record.
With respect to Juror no. 27, the trial court found the lack-of-intelligence reason to be race neutral and supported by the record “[biased on the court’s observations and the responses given on this case.” (RTR, C. 108.) However, my review of the proceedings reflects that the only “responses” Juror no. 27 gave during voir dire were her name, occupation, and marital status, all of which she supplied during roll call. She answered no questions during general voir dire of the entire venire, nor was she questioned during individual voir dire. It is difficult to fathom how a simple statement as to one’s name, occupation, and marital status could establish a lack of intelligence. Also, as Judge Joiner, a former circuit judge himself, notes in his special concurrence, it is a “near impossibility that a prosecutor or circuit judge— who has experienced hundreds of trials (possibly including many capital-murder trials) and interacted with thousands of jurors over a number of years — would remember the details surrounding the strikes of jurors for a trial that had concluded many months or even many years before.” 151 So.3d at 372 (Joiner, J., concurring specially). In addition, I fail to see any connection between a person’s exterior appearance and demeanor — which the trial court observed — and that person’s intellectual level. Thus, contrary to the trial court’s finding, with respect to Juror no. 27, the lack-of-intelligence reason proffered by the State is wholly unsupported by the record.
With respect to Juror no. 47, the trial court also noted that it had observed this juror and her demeanor and that “lack of sophistication of a prospective juror when faced with technical expert evidence in a case has been held to constitute a race-neutral reason for the use of a peremptory challenge.” (RTR, C. 110.) However, other than stating during roll call her name, occupation, and marital status, Juror no. 47 answered only two questions during general voir dire, one of which required Juror no. 47 simply to raise her hand and to state her assigned juror number. Although Juror no. 47 was questioned during individual voir dire, she was asked only five questions. Again, it is difficult for me *381 to fathom how a person’s intellectual level could be ascertained after only a few sentences. Thus, contrary to the trial court’s finding, with respect to Juror no. 47, the lack-of-intelligence reason proffered by the State is also unsupported by the record.
In addition, the State’s sole basis for concluding that Jurors no. 27 and 11 would not be able to understand DNA evidence was those jurors’ employment — Juror no. 27 was a packer and Juror no. 11 was then unemployed and had no knowledge of her ex-husband’s employment. However, as the trial court found in its order, the nature of a person’s employment or the lack of employment, by itself, is not sufficient to establish a lack of intelligence. Nor is there any logical connection between a person’s lack of knowledge of an ex-spouse’s employment and that person’s ability to understand DNA evidence. Yet the prosecutor made no attempt in this case to question these jurors (or any of the jurors on the venire, for that matter) regarding their intelligence level or their ability to understand DNA evidence. “[T]he failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination.” Ex parte Bird, 594 So.2d at 683. Rather, the prosecutor merely assumed that Jurors no. 27 and 11 would not be able to understand DNA evidence because Juror no. 27 was employed in a manual-labor or blue-collar job and Juror no. 11 was unemployed and had no knowledge of her ex-husband’s employment. Therefore, this reason for striking Jurors no. 27 and 11 was clearly based on a group bias against blue-collar workers and the unemployed where the trait of concern — intelligence — was not shown to apply to these two particular jurors. Although certainly not conclusive, group bias is evidence that the reason for a strike is a sham or pretext for discrimination.
I also note that the State appeared to use this “lack-of-sophistication” reason not merely for Jurors no. 27 and 11, but for a total of 8 of its 11 strikes of African-American jurors — as noted previously, Jurors no. 37, 39, 52, 27, 11, 38, 47, and 74, were all struck, in part, because of an alleged lack of “sophistication.” In other words, 72 percent of the State’s strikes against African-American jurors were based, at least in part, on those jurors’ supposed lack of intelligence. This is a troubling statistic in light of the historically suspect nature of this reason. Equally troubling is the fact that the record does not support any of the State’s strikes for this reason. As with Jurors no. 27 and 11, the State’s supposed belief that Jurors 37, 39, 52, 38, 47, and 74 lacked sufficient intelligence to understand DNA evidence was also based primarily on those jurors’ employment — Juror no. 37 was a custodian, Juror no. 39 was unemployed, Juror no. 52 drove a forklift, Juror no. 38 was a rental-car agent, Juror no. 47 was a cafeteria manager, and Juror no. 74 was a secretary. With respect to these six jurors, the State made the same unsupported group-based assumption it made with Jurors no. 27 and 11 — that those jurors who were unemployed or who worked manual-labor or blue-collar jobs were not sufficiently intelligent to understand DNA evidence— without questioning any of them regarding their intelligence level or their ability to understand DNA evidence.
With respect to Juror no. 38, the State relied not only on employment but also on a misspelled word on the juror questionnaire to conclude that she lacked intelligence. However, as the trial court found in its order, the fact that a juror misspelled a single word on a juror questionnaire fails to establish lack of intelligence, especially in light of the fact that Juror no. 38 stated on her juror questionnaire that *382 she had attended college and had received a bachelor’s degree. In addition, my review of the juror questionnaires reveals that Caucasian jurors who were not struck by the State also misspelled one or more words on their juror questionnaires. Specifically, Juror no. 5 misspelled “police,” Juror no. 24 misspelled “channel,” and Juror no. 33 misspelled “chamber” and “robbery,” but they all sat on Sharp’s jury.
Despite these circumstances, the trial court found this reason to be race neutral with respect to Juror no. 38 “when coupled with her employment history and her demeanor.” (C. 110.) However, as explained above, I fail to see the connection between a person’s external appearance and demeanor and that person’s intelligence level. In addition, this finding by the trial court is quite troubling given (1) the lack of support for it in the record, and (2) the trial court’s own questioning of this reason during the hearing on remand. The State’s assertion that Juror no. 38 had a “checkered” employment history and had worked for only 7 months in the last 10 years is directly refuted by the record. On her juror questionnaire, Juror no. 38 stated, on the first page of the questionnaire, that she had retired from the Department of Defense as a program analyst in 2003, approximately three years before Sharp’s trial. At the hearing on remand, the trial court, evidently concerned about the validity of this proffered reason, specifically asked the State if it was aware that Juror no. 38 was a retiree, and the State indicated that it was not, despite the fact that Juror no. 38 clearly indicated her retired status on the first page of the juror questionnaire.
Further, the record discloses disparate treatment by the State with regard to its “lack-of-sophistieation” reason for striking jurors. Although the State struck 8 African-Americans based on “lack of sophistication,” either because they were unemployed or were employed in manual-labor or blue-collar jobs, the State did not strike Juror no. 43, a Caucasian who indicated on her juror questionnaire that she was a housewife and had been unemployed for the last 10 years. See, e.g., Carter v. State, 603 So.2d 1137 (Ala.Crim.App.1992). The State attempted to justify this disparate treatment at the hearing on remand, explaining that it did not strike Juror no. 43 because her husband had once testified as an expert witness and her two adult children were “educated,” a conclusion apparently based on Juror no. 43’s answer on the juror questionnaire that her son was an engineer and her daughter was a teacher. However, the fact that Juror no. 43 was married to someone who had once been an expert witness and that she had two adult children who were “educated” in no way shows the intellectual level of Juror no. 43 or the ability of Juror no. 43 to understand DNA evidence.
I recognize that disparate treatment evident in the record may, in some circumstances, be overcome by a sufficient explanation by the State. For example, as the Alabama Supreme Court explained in Ex parte Brown, 686 So.2d 409 (Ala.1996):
“A prosecutor can strike based on a mistaken belief, see Taylor v. State, 666 So.2d 36, 42 (Ala.Cr.App.1994); therefore, it is logical that a prosecutor may also decide, based on a mistaken belief, not to strike a veniremember. Because the discrepancy in the way these two jurors were treated was adequately explained, we conclude that the strike of Juror 19 was race-neutral.”
686 So.2d at 420. In this case, however, I believe the State’s explanation for not striking Juror no. 43 was insufficient to dispel the disparate treatment here. Indeed, the State’s proffered explanation of the disparate treatment is, itself, support *383 for the conclusion that there was disparate treatment. Despite its reliance on the education level of Juror no. 43’s adult children to conclude that she was sufficiently intelligent to understand DNA evidence, the State struck Jurors no. 47 and 74, both African-Americans, in part, because they were not sufficiently intelligent even though both had at least one adult child who was “educated” — Juror no. 47 had a daughter who was a nurse and Juror no. 74 had a son employed in information technology.
Finally, although at the hearing on remand the State asserted that it was concerned with seating jurors who were sufficiently intelligent to understand the complex and technical DNA evidence that was to be presented at Sharp’s trial, the record of voir dire belies this assertion. During voir dire, the State questioned the venire about DNA evidence as follows:
“Now what we have here is forensic science, real life forensic science that you’ll be confronted with, and specifically it is DNA evidence. You’ll hear some cutting edge technology on DNA evidence that was recovered at the scene. And you are not expected to be a scientist or to become a scientist if you’re chosen on this jury. And I’m not saying DNA is impossible to understand, because obviously if I imderstand it and [the other prosecutor] can understand it and these gentlemen [defense attorneys] can understand it, then, you know, you don’t have to be super smart to understand it. But what I want to ask you is, is there anybody here who thinks the nature of that testimony, and by the nature I mean it’s scientific, do you think that it would be difficult for you to be a juror in that, not because you’re not smart enough, I’m not asking you that, but because it’s just something that would bore you to tears and you don’t think — you don’t think you could pay attention to it, to that kind of testimony?”
(R. 243; emphasis added.) Contrary to the State’s contention at the hearing on remand, the State was not concerned, at the time it questioned and struck the jury, with the ability of the potential jurors to understand the DNA evidence to be presented because “you don’t have to be super smart to understand it.”
For these reasons, I must conclude that the State’s proffered reason — that Jurors no. 27 and 11 were not sufficiently “sophisticated” to understand DNA evidence — is pretextual.
II.
The State also proffered as a reason for striking both Juror no. 27 and Juror no. 11 that each may have had a prior conviction, specifically that “[i]t appeared” that Juror no. 27 had a prior conviction for possession of marijuana at a time when the prosecutor had been working exclusively on drug-related cases[22] and that Juror no. 11 had a prior conviction for issuing a worthless check. However, on the juror questionnaires, potential jurors were asked whether they, or any relative or close friend, had ever been accused of a crime and what the outcome, if any, of that accusation was. Juror no. 27 stated “no” in answer to the question, and Juror no. 11 indicated that her brother had previously been accused and convicted of a crime, but she did not list herself as having ever been accused of a crime. The State never questioned these jurors about their criminal history or about the alleged discrepancy between its *384 alleged records of the prior convictions (to which the State referred at the hearing on remand but which are not included in the record before this Court) and the jurors’ responses on the questionnaire. As noted above, “the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination.” Hemphill v. State, 610 So.2d 413, 416 (Ala.Crim.App.1992).
Instead of considering the lack of questioning here as evidence of discrimination, however, the majority excuses the State’s failure to question these jurors about their alleged prior convictions because, it rationalizes, such questioning would have “embarrassed Jurors no. 27 and 11 in front of the other veniremembers” and .“would likely have had a chilling effect on the other jurors’ freely answering voir dire questions,” and because “[i]t could even have resulted in potential jurors becoming embittered toward the prosecutor for having embarrassed a fellow veniremember.” 151 So.3d at 369. However, the majority’s rationale fails in the face of the record before this Court. The record reflects that the venire was initially questioned as a whole, but that potential jurors were given the option of speaking to the parties and the court in private instead of in front of the entire venire. The parties were also specifically given the opportunity to question any member of the venire individually, outside the presence of the other potential jurors, about anything they wished. A number of potential jurors voluntarily approached to speak with the parties and court in private, and several additional jurors were questioned individually at the request of the parties. However, neither Juror no. 27 nor Juror no. 11 were questioned individually. Thus, contrary to the majority’s conclusion, the State clearly had the opportunity to question these jurors about their prior criminal history and about the alleged discrepancy between their answers on the questionnaire and the State’s alleged records during individual voir dire without fear of embarrassing those jurors in front of other potential jurors and without fear of creating “a chilling effect” on other potential jurors, but it did not do so. Therefore, I cannot, as the majority does, excuse the State’s failure to question these jurors.
The majority also excuses the State’s failure to question Jurors no. 27 and 11 about their alleged prior convictions because, it says:
“Once the State discovered that a discrepancy existed between the public records of conviction and the sworn responses provided by Jurors no. 27 and 11, it would have been apparent to the State that Jurors no. 27 and 11 had not been truthful in answering their juror questionnaires.”
151 So.3d at 368. This conclusion by the majority is problematic, for several reasons.
First, the majority assumes, as did the trial court in its order, that the State was aware that Jurors no. 27 and 11 did not state on their juror questionnaires that they had prior convictions and that the State would have struck these jurors for allegedly not answering truthfully. However, the State did not even mention the juror questionnaires when providing this reason for striking Jurors no. 27 and 11, much less indicate that it was striking Jurors no. 27 and 11 because they had allegedly not answered questions truthfully. Although the failure of a potential juror to answer questions truthfully would certainly be a valid reason for a peremptory strike, neither a trial court nor an appellate court may substitute what would be a valid non-pretextual reason for a peremptory strike (the failure of a potential *385 juror to answer questions truthfully) for the reason that was actually provided by the State (the potential juror allegedly had a prior conviction). “If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.” Miller-El v. Dretke, 545 U.S. 231, 252, 125 S.Ct. 2317,162 L.Ed.2d 196 (2005) (emphasis added).
In addition, as explained above, the State was wholly unaware of the answers provided by Juror ho. 38 on her juror questionnaire. The State asserted as a reason for striking Juror no. 38 that she had a “checkered” employment history and had worked for only 7 months in the last 10 years despite the fact that on the first page of her juror questionnaire, Juror no. 38 had stated that she had retired from the Department of Defense as a program analyst in 2003, approximately three years before Sharp’s trial. When questioned on this topic at the hearing on remand, the State indicated that it was not aware of Juror no. 38’s status as a retiree, despite that fact being clearly stated on her juror questionnaire. Thus, I cannot assume, as the majority does, that the State was aware of the answers provided by Jurors no. 27 and 11 on their questionnaires or that the State would have struck Jurors no. 27 and 11 for allegedly not answering questions truthfully.
Second, the majority assumes that Jurors no. 27 and 11 actually had prior convictions. However, nothing in the record supports this assumption. The only indication in the record that Jurors no. 27 and 11 had any prior convictions was the assertion by the prosecutor. “[UJnsworn statements, factual assertions, and arguments of counsel are not evidence.” Ex parte Russell, 911 So.2d 719, 725 (Ala.Civ.App.2005). On the other hand, the responses of Jurors no. 27 and no. 11 on their juror questionnaires, which, as the majority recognizes, were “sworn” under oath, indicated that neither had any prior convictions. 151 So.3d at 375. Although the trial court noted generally in its order that a peremptory strike based on information that a potential juror has a criminal history is race neutral (a statement with which I do not disagree), the trial court never made a finding of fact as to whether Jurors no. 27 and 11 actually had any prior convictions.
In addition, the alleged “records” the State referred to on remand to support its assertion that Jurors no. 27 and 11 had prior convictions are not included in the record before this Court. Although I do not disagree with the majority that criminal convictions are a matter of public record, and the State, in its application for rehearing, does assert that the convictions of Jurors no. 27 and 11 can be found on alaeourt.com, it is well settled that “[a]n appellate court cannot consider matters and allegations outside the record.” Childs v. State, 574 So.2d 1023, 1024 (Ala.Crim.App.1990). In addition, although “[t]his Court may take judicial notice of its own records,”[23] Wilkerson v. State, 70 So.3d 442, 448 n. 2 (Ala.Crim.App.2011), “[generally, a court may not take judicial notice of the records of another court.” Worthington v. Amerson, 741 So.2d 437, 438 n. 2 (Ala.Civ.App.1999). As the Alabama Supreme Court explained in Green Tree-AL LLC v. White, 55 So.3d 1186 (Ala.2010):
“‘It has long been our rule that an appellate court may not rely on facts *386 outside the record.... Moreover, a court may not ordinarily take judicial notice of the records of another court. See Belyeu v. Boman, 252 Ala. 371, 373, 41 So.2d 290, 291 (1949) (holding that the Supreme Court of Alabama may not take judicial notice of the records of the trial court unless those records appear in the clerk’s record or in the records of the Supreme Court); Worthington v. Amerson, 741 So.2d 437, 438 n. 2 (Ala. Civ.App.1999) (“Generally, a court may not take judicial notice of the records of another court.”).’ ”
55 So.3d at 1193 (quoting Ex parte Jett, 5 So.3d 640, 645-46 (Ala.2007) (See, J., concurring specially)). See also Nesby v. City of Montgomery, 652 So.2d 784, 786 (Ala. Crim.App.1994) (“This Court cannot take judicial notice of ‘other proceedings.’ ”). Although it may have been permissible for the trial court to have taken judicial notice of the State’s alleged “records” of convictions if those convictions had occurred in the Madison Circuit Court, there is no indication in the record before this Court that the trial court did so. Indeed, there is no indication in the record that the trial court even looked at the alleged records relied on by the State — the trial court did not mention these “records” in its order. Rather, the trial court merely accepted at face value the State’s explanation without considering all the relevant circumstances.
Notably, the State had the opportunity on remand to provide support for its assertion that Jurors no. 27 and 11 had prior convictions; it failed to do so. When Sharp pointed out in his written response the lack of support in the record for the assertion that Jurors no. 27 and 11 had prior convictions and the fact that the juror questionnaires established no such pri- or convictions, the State did not respond to the argument in its written reply. I recognize that “[t]he fact that a prosecutor’s stated reason for striking a juror is not reflected in the record does not necessarily make that reason pretextual.” Martin v. State, 62 So.3d 1050, 1060 (Ala.Crim.App.2010). In addition, this Court has held that “[tjhere is no requirement that a pros^ ecutor establish evidentiary support for every strike in every case, especially where the defendant has not specifically questioned the validity of the prosecutor’s explanations or demanded further proof” Hall v. State, 816 So.2d 80, 85 (Ala.Crim. App.1999) (emphasis added). However, under the specific circumstances in this case — among other things, where Sharp specifically questioned the validity of this reason for striking Jurors no. 27 and 11 in his written response and this reason is not supported by the record — I believe it was incumbent on the State to at least reply to Sharp’s argument, if not to provide evidence of the alleged prior convictions. Cf., Ex parte Thomas, 601 So.2d 56, 58 (Ala. 1992) (holding that the trial court erred in not ordering the State to provide to the defense the document listing misdemeanors and traffic infractions of potential jurors that was used by the State as the sole basis for striking several African-American veniremembers because, in refusing to do so, the trial court merely “accepted] at face value the State’s ostensibly facially neutral explanations for the use of its peremptory strikes,” which is prohibited).
Therefore, I cannot, as the majority does, simply assume that the prosecutor’s unsworn factual assertion that Jurors no. 27 and 11 had prior convictions is true and assume that the sworn statements by Jurors no. 27 and 11 on their juror questionnaires are false. Rather, all I am permitted to do is consider the circumstances in the record before me, all of which lead me to conclude that the State’s failure to question Jurors no. 27 and 11 cannot be excused but must be considered evidence, albeit not conclusive by itself, that the *387 prior-conviction reason for striking Jurors no. 27 and 11 was a pretext for discrimination.
Also evidence of discrimination is the disparate treatment disclosed by the record with respect to the prior-conviction reason. The State struck Jurors no. 27 and 11, as well as Juror no. 47, all African-Americans, in part, because they had at least one prior conviction. Yet the State did not strike Juror no. 24, a Caucasian, who stated on his questionnaire that he had previously been convicted of assault, and Juror no. 24 sat on Sharp’s jury. As this Court explained in Yancey v. State, 813 So.2d 1 (Ala.Crim.App.2001):
“Though we have held that striking a prospective juror because of a prior criminal history is a race-neutral reason, we have also held that the failure to strike both whites and blacks because of prior criminal records is evidence of disparate treatment, in violation of Batson. See Powell v. State, 548 So.2d 590 (Ala. Crim.App.1988), aff'd, 548 So.2d 605 (Ala.1989). ‘Such disparate treatment of otherwise similarly situated persons who happen to be of different racial backgrounds, would evidence discriminatory intent in the State’s use of its strikes.’ Bishop v. State, 690 So.2d 498, 500 (Ala. Crim.App.1995), on remand, 690 So.2d 502 (Ala.Crim.App.1996).”
813 So.2d at 7. See also Rice v. State, 84 So.3d 144, 149 (Ala.Crim.App.2010), and Preachers v. State, 963 So.2d 161, 167-69 (Ala.Crim.App.2006).
The majority concludes that there was no disparate treatment by the State in this regard because, it says, Jurors no. 27 and 11 were not “similarly situated” to Juror no. 24. In reaching this conclusion, the majority again assumes, with no support in the record, that Jurors no. 27 and 11 actually had prior convictions and reasons that because Juror no. 24 disclosed his prior conviction on his juror questionnaire while Jurors no. 27 and 11 did not disclose their alleged prior convictions on their juror questionnaires, Juror no. 24 cannot be “similarly situated” to Jurors no. 27 and 11 for purposes finding disparate treatment. As already explained, however, I cannot assume that Jurors no. 27 and 11 actually had prior convictions when the record does not support that assumption. Likewise, the record reflects that the alleged failure of Jurors no. 27 and 11 to answer questions truthfully was not a basis offered by the State for striking these jurors nor was it a basis offered by the State to explain the disparate treatment.
As noted above, the State did not respond to Sharp’s argument in his written response that the record did not support the assertion that Jurors no. 27 and 11 had prior convictions. In fact, the State failed in its written' reply to respond to any of Sharp’s arguments. Rather, the State made only a general denial of any discriminatory intent and claimed that Sharp’s numerous arguments regarding disparate treatment were based on a flawed analysis. Specifically, the State argued that its strikes were based on the aggregate characteristics of a particular juror and that none of the Caucasian jurors in this case who were not struck by the State shared all the same aggregate characteristics as the African-American jurors who were struck and, thus, that there could be no disparate treatment. The majority’s view is similar — it picks one difference between Jurors no. 27 and 11 and Juror no. 24 and concludes that the jurors were not “similarly situated” because of that single difference. Both the State and the majority appear to believe that as long as there is at least one alleged difference between a struck African-American juror and a Caucasian juror who was not struck, there can be no disparate treatment.
*388 However, “to prove disparate treatment in jury selection, it is not necessary to show that the excluded venire panelist was similarly situated to a white potential juror in all respects.” United States v. Torres-Ramos, 586 F.3d 542, 559 (6th Cir.2008). Indeed, the likelihood of two potential jurors sharing all the same characteristics and having no differences at all is remote, at best, which is why such a view has been expressly rejected by the United States Supreme Court. As explained in Dretke:
“None of our cases announces a rule that no comparison of [potential jurors] is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one.... A per se rule that a defendant cannot win a Batson claim unless there is an exactly identical white juror would leave Batson inoperable; potential jurors are not products of a set of cookie cutters.”
545 U.S. at 247 n. 6. The record here reflects no significant differences between Juror no. 24 and Jurors no. 27 and 11 that would render them not “similarly situated” for purposes of disparate-treatment analysis.
The totality of the circumstances — including the State’s lack of questioning of jurors regarding their prior convictions, the lack of support in the record for the State’s proffer that Jurors no. 27 and 11 had prior convictions, the disparate treatment of African-American and Caucasian jurors who had prior convictions, and the fact that the State also proffered for striking Jurors no. 27 and 11 the pretextual reason that Jurors no. 27 and 11 were not sufficiently intelligent, as explained above — leaves me no choice but to conclude that the prior-conviction reason for striking Jurors no. 27 and 11 was also pretextual.
III.
The State also proffered as a reason for striking Juror no. 27 that she had answered “no” on question 79 on the juror questionnaire and proffered as a reason for striking Juror no. 11 that she had not answered question 79 on the questionnaire and had not “fully” answered question 74 on the questionnaire. With respect to Juror no. 27, although she did, in fact, answer “no” to question 79, indicating that she could not be fair if she had heard anything in the media regarding this case, Juror no. 27 indicated that she had not, in fact, heard anything in the media regarding the case. During general voir dire of the entire venire, Juror no. 27 did not respond when asked if anyone had read or heard about the case through the media. On the juror questionnaire, the following six questions — questions 68, 69, 70, 71, 78, and 79 — asked about the potential jurors’ knowledge of the case:
“68. Do you know anything about the facts of this case other than what you have heard in Court today? Yes _No_ If yes, please explain.
“69. From what source have you heard about this case?
“70. Have you discussed this case with someone who claimed to know something about the facts of this case? Yes_No_ If yes, please explain.
“71. Have you heard of this defendant or anything about him apart from anything stated here in open court today? Yes_No_ If yes, what is the source' of this information, and please explain how you obtained this information.
[[Image here]]
“78. What, if anything, have you heard in the media regarding this case?
“79. If you have heard anything in the media regarding this case, do you *389 feel you can still be fair and impartial to both sides? Yes_No_ If no, please explain.”
Juror no. 27 answered “no” to question 68, “none” to question 69, “no” to questions 70 and 71, and “nothing” to question 78. As applied to Juror no. 27 then, question 79 was nothing more than a hypothetical question and, in context, when Juror no. 27 answered “no” to question 79, she was not indicating that she could not be fair and impartial in the case but was indicating that if the circumstances were different, i.e., if she had actually heard about the case through the media, she would not be able to be fair and impartial. Thus, this answer by Juror no. 27 was no basis for the State’s proffered “concern.” Indeed, a simple question during voir dire could have cleared up any “concern” by the State regarding this juror’s impartiality. However, the State did not question Juror no. 27 about her answer to question 79. Indeed, as noted previously, Juror no. 27 was not questioned individually at all.
With respect to Juror no. 11, she, too, did not respond during general voir dire when asked if anyone had read or heard about the case through the media. In addition, she, too, indicated on the questionnaire that she had not heard anything about the case, answering “no” to questions 68, 70, and 71, not answering question 69, and answering “nothing” to question 78. Because Juror no. 11 had heard nothing about the case, there was no reason for her to answer question 79 which, as with Juror no. 27, was purely hypothetical as applied to her. Moreover, as with Juror no. 27, the State did not question this juror about her failure to answer question 79. Finally, the record reflects that many potential jurors did not answer question 79 on the questionnaire. Of particular importance here is the fact that Jurors no. 24, 29, 33, 66, 68, and 79 — all Caucasians — also did not answer question 79 on the questionnaire, but none of these jurors was struck by the State, and all were chosen to sit on Sharp’s jury.[24] Although the lone African-American juror who sat on Sharp’s jury also did not answer question 79 on the questionnaire, this does not diminish the evident disparate treatment in the record.
In addition, question 74 on the questionnaire asked:
“Do you feel the accused is guilty just because he/she is in the courtroom today? Yes_No_ If no, please explain.”
Juror no. 11 answered “no” to this question but did not explain as requested. However, of the 14 jurors selected for service, only one provided an explanation to this question or, as phrased by the prosecutor, “fully” answered this question. Although all 14 jurors selected to serve answered “no” to this question — as did Juror no. 11 — 12 of those jurors provided no explanation at all for their answer, just like Juror no. 11, and one indicated “N/ A.” Thus, it would not appear that the State was overly concerned about the failure of jurors to “fully” answer question 74, despite its claim to the contrary at the hearing on remand. “This court has condemned the failure to strike white venire-persons who share the same characteristics as black venirepersons who were struck.” Bishop v. State, 690 So.2d 498, 500 (Ala.Crim.App.1995). Moreover, the State did not question Juror no. 11, or any of the potential jurors, with respect to question 74.
Accordingly, based on the disparate treatment and lack of questioning, and in *390 light of the other pretextual reasons proffered by the State for striking Jurors no. 27 and 11, as discussed above, I must conclude that these reasons for striking Jurors no. 27 and 11 were also pretextual.
IV.
Finally, the State proffered as its “first” reason for striking Juror no. 11 that she was a Seventh Day Adventist and, thus, that she could not work on Saturdays because of her religious beliefs. The record reflects that during group voir dire, the trial court informed the venire that the trial might last through Saturday of that week and asked if anyone had a problem with working Saturday and, if so, to write that on the questionnaires they were going to complete that afternoon or inform the court during individual voir dire. Juror no. 11 did not state on her questionnaire that she had a problem with working on Saturday, although she did indicate on the questionnaire that she was a Seventh Day Adventist. The State also did not question Juror no. 11 about her ability to work on Saturday.[25] Rather, the State merely assumed, based solely on religious affiliation, that Juror no. 11 could not work on Saturday. The fact, however, that a person holds a certain religious affiliation does not establish that he or she subscribes to all of the beliefs of that religion. As noted previously, a group bias where the trait of concern — in this case, the inability to work on Saturday — was not shown to apply to this particular juror is evidence that the proffered reason for striking Juror no. 11 is a sham or pretext for discrimination.
In addition, the State’s lack of questioning of this juror, which could have easily cleared up any concern as to whether this juror could work on Saturday, is also evidence of discrimination. Therefore, for these reasons, and in light of the State’s other pretextual reasons proffered for the strike of Juror no. 11, as explained above, I must conclude that this reason for striking Juror no. 11 was also pretextual.
V.
My conclusion that all of the State’s reasons for striking Juror no. 27 and Juror no. 11 were pretextual is buttressed by the questionable reasons the State proffered for its strikes of other African-American jurors. Having determined that the reasons for striking Jurors no. 27 and 11 were pretextual, I would closely scrutinize the State’s remaining strikes. Once the State’s reasons for striking a potential juror are found to be invalid, the reasons for striking other jurors become suspect and are subject to greater scrutiny. See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991), and Maddox v. State, 708 So.2d 220 (Ala. Crim.App.1997). As the Alabama Supreme Court explained in Ex parte Bird:
“Although one unconstitutional peremptory strike requires reversal and a new trial, we take this opportunity to accentuate the specific weaknesses of the State’s explanations regarding a number of its challenges. In doing so, we point out that the State’s failure to articulate a legitimate reason for its challenge of veniremember number 26 exposes its rationale for subsequent strikes to greater scrutiny. See State v. Antwine, 743 S.W.2d 51, 64 (Mo.1987). Thus, even explanations that would or *391 dinarily pass muster become suspect where one or more of the explanations are particularly fanciful or whimsical.”
594 So.2d at 683 (emphasis added).
One of the reasons the State proffered for striking Juror no. 39 was that he had a friend who was a pastor and either was himself or knew someone involved in prison ministries and one of the reasons the State proffered for striking Juror no. 52 was that she was studying to be a minister and “that was not the kind of juror [the State was] looking for.” (RTR, R. 13.) However, the State did not strike Juror no. 79, a Caucasian, who was a minister and who indicated on his questionnaire that he had previously volunteered visiting inmates in prison.
In addition, one of the reasons the State proffered for striking Juror no. 47, an African-American, was that she had answered on the juror questionnaire that she believed the State should have to prove its case beyond all doubt and that a criminal defendant should have to testify on his or her own behalf. However, when proffering this reason at the hearing on remand, the State admitted that many other jurors, some of whom sat on Sharp’s jury, had answered similarly. Indeed, the record reflects that half of the petit jurors had answered similarly to Juror no. 47. Specifically, Jurors no., 5, 29, 44, 46, 59, and 70 — all Caucasians who sat on Sharp’s jury — answered on their questionnaires that they believed the State should have to prove its ease beyond all doubt. Additionally, Caucasian Juror no. 59 answered on the questionnaire — exactly like struck African-American Juror no. 47 — that he believed a criminal defendant should have to testify on his or her own behalf.
Finally, one of the reasons proffered for striking Juror no. 74 was that she had a son who had been the victim of two robberies and that there had been no arrest or conviction for either of those crimes. Similarly, one of the reasons proffered for striking Juror no. 55 was that she had a son who had been the victim of attempted murder and that there had been no arrest or conviction for that crime. However, the State did not strike Juror no. 66 — a Caucasian who sat on Sharp’s jury — who indicated that he had been the. victim of assault and, although an arrest was made, no conviction resulted. Likewise, the State did not strike Juror no. 68 — a Caucasian who also sat on Sharp’s jury — and who had been the victim of date rape and there had been no arrest or conviction in connection with that crime. Additionally, several other Caucasian jurors who sat on Sharp’s jury had, themselves, been victims of violent crimes similar to that endured by Juror no. 74’s son, although all of those crimes resulted in arrésts and convictions.
I recognize the inherent difficulty facing prosecutors who have to provide reasons for peremptory strikes years, and hundreds of trials, after those strikes were made. I also recognize that disparate treatment of jurors may have a legitimate explanation. Peremptory strikes are, after all, often based on instinct. However, as the United States Supreme Court explained in Dretke:
“[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pre-textual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.”
545 U.S. at 252.
Under the circumstances in this case, after thoroughly reviewing the record, ex *392 amining the reasons proffered by the State for its strikes and the arguments made by Sharp in response,[26] and considering all relevant circumstances, I have no choice but to conclude that the State exercised its peremptory strikes in a discriminatory manner against African-Americans, in violation of Batson. Therefore, I believe that Sharp is entitled to a new trial, and I must respectfully dissent.
WELCH, J., concurs.

. I note that the United States Court of Appeals for the Eleventh Circuit has expressly rejected Alabama’s general rule as being "an unreasonable application of law under Batson." McGahee v. Alabama Dep’t of Corrections, 560 F.3d 1252, 1264 (11th Cir.2009). However, this Court is not bound by the decisions of the Eleventh Circuit. See, e.g., Ex parte Hale, 6 So.3d 452, 458 n. 5 (Ala.2008).

. " ' “[T]he plain-error doctrine applies only if the error is 'particularly egregious' and if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' ’ " Ex parte Billups, 86 So.3d 1079, 1083 (Ala.2010) (quoting Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008), quoting in turn Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)).

. The prosecutor, however, did not affirmatively state whether he had actually prosecuted Juror no. 27.

. I have searched this Court’s records and have found no evidence of convictions for either Juror no. 27 or Juror no. 11.

. Juror no. 79, although initially sitting on Sharp’s jury, was replaced by an alternate during trial. This fact, however, does not alter the Batson analysis.

. As the majority correctly notes, a total of three jurors indicated on their questionnaires that their religion generally prohibited working on Saturdays — Juror no. 11 and Juror no. 39 indicated that they were Seventh Day Adventists, and Juror no. 52 indicated that she was a Sabbath Keeper — and the State struck all three of those jurors. However, only one of those jurors, Juror no. 39, actually indicated, during individual voir dire, that his religious beliefs would prohibit him from serving as a juror on Saturday.

. See Maddox v. State, 708 So.2d 220, 223 (Ala.Crim.App.1997) (noting that "[i]n determining whether the reasons given by the State for its peremptory challenges are pre-textual, the ... court has a duty to consider the evidence offered by both the State and by the defense in rebuttal”).